Horace Anthony BUTLER, Appellant,

v.

UNITED STATES, Appellee.

Ali ABDUL–MANI, Appellant,

v.

UNITED STATES, Appellee.

Nos. 82–323, 82–1387 and 82–314.

District of Columbia Court of Appeals.

Argued Jan. 12, 1984.

Decided July 23, 1984.

David Adam Reiser, Washington, D.C., with whom Michael S. Spearman, Washington, D.C., appointed by the court, was on the brief for appellant Butler.

James Klein, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the brief was filed, and Scott Howe, Public Defender Service, Washington, D.C., were on the brief for appellant Abdul-Mani. Linda Jacobson, Public Defender Service, Washington, D.C., also entered an appearance for appellant Abdul-Mani.

Mary Ellen Abrecht, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell, Judith Hetherton, and Harold L. Cushenberry, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before NEWMAN, Chief Judge, and FERREN, and PRYOR, Associate Judges.

NEWMAN, Chief Judge:

This case involves events surrounding the highly publicized July 1980 assassination of Ali Akbar Tabatabai. Appellants Horace Butler and Ali Abdul-Mani were convicted as accessories after the fact to first-degree murder. Butler was also convicted of grand larceny and unauthorized use of a motor vehicle. In addition, Abdul-Mani was convicted of two counts of perjury.[1]

Tabatabai was an outspoken opponent of the regime of the Ayatollah Khomeini in Iran. Tabatabai worked in the Shah's government before the Iranian revolution. In 1979 he founded and became president of the Iran Freedom Foundation, a corporation chartered in the state of Maryland. He often criticized Khomeini's rule in press releases and television appearances here in

---

1. The trial court entered a judgment of acquittal on one of the perjury counts. Both Butler and Abdul-Mani were acquitted on conspiracy counts. A codefendant, William Caffee, was acquitted of all charges. The alleged triggerman, David Belfield, has successfully evaded apprehension.

the United States. With others, Tabatabai had planned an anti-Khomeini demonstration in Washington, D.C. for the week of July 20 to 27, 1980. He was murdered on July 22, 1980 at his residence in Bethesda, Maryland.

David Belfield—a pro-Khomeini, armed security guard at the Iranian Interests Section of the Algerian Embassy—had received an assignment to assassinate Ali Akbar Tabatabai and other opponents of Khomeini.

Al Fletcher Hunter, an accomplice who testified for the government after a grant of immunity, came to know Belfield through martial arts training and first heard of the assassination plan in mid-June 1980, when Belfield showed him pictures of Ali Akbar Tabatabai and other opponents of the Ayatollah Khomeini. Having already committed a number of crimes for the benefit of the Islamic revolution and for his own financial benefit, Hunter became a willing participant in the assassination plan as well. Hunter testified that he went to the Library of Congress in a vain effort to gather information about Tabatabai, and several times he drove with Belfield to the Bethesda, Maryland, neighborhood where Tabatabai lived. According to the plan, the assassin was to pose as a postman and needed a getaway car. Hunter made inquiries about procedures for renting a car for a week and told Belfield, who had thousands of dollars in $100 bills, that they would need a credit card to rent a car. Hunter testified that Belfield assured him that he knew someone with a credit card and would take care of it.

Meanwhile, Belfield pursued other aspects of the assassination plan. On July 20, 1980, Belfield visited a postman acquaintance, Tyrone Frazier, and discussed procedures for delivery of certified and registered packages for receipt of addressee only. Belfield pressured Frazier to

agree to lend him his postal jeep so that he could make a delivery. Belfield assured Frazier that he could make the taking of the jeep appear to be forced. He left Frazier two $100 bills, instructions to meet him at the northwest intersection of Idaho Avenue and Woodley Road the next day and instructions on how to receive $300 more when the job was done.

On July 21, Abdul-Mani tried to rent a car with his Central Charge card. Because he already owed $550 and had a credit limit of $600, Central Charge would not approve the $300 charge required by Budget Rent-A-Car, or the $225 charge required by National Car Rental unless a cash payment was made to lower the debt. Soon thereafter, $225 in cash was paid on Abdul-Mani's Central Charge account at 1215 E Street, N.W.[2] Then Abdul-Mani successfully used his Central Charge card to rent a blue Toyota from National Car Rental at 1001 12th Street, N.W.

Testimony at trial indicated that Abdul-Mani was known throughout his community as a peaceful man. He was married, employed and the father of six children at the time of indictment. He had never been arrested.

Abdul-Mani attended services at the Islamic Center on Massachusetts Avenue, where almost every local Moslem worships. At the mosque he met David Belfield, a fairly well-known person in that community. A close friendship never developed, yet Belfield, like others, found that if he came to Abdul-Mani needing a loan, he would get it. He repaid borrowed money and on occasion successfully asked Abdul-Mani for the use of his car. Abdul-Mani was known for his generosity and willingness to help others in the community.

Hunter's testimony outlined the sequence of events leading to the assassina-

2. In a subsequent search of Butler's apartment, investigators found a note in Belfield's handwriting with the words "car," "$225," and "Ali". From this note, the government asked the jury to infer that Belfield provided the money which allowed Ali Abdul-Mani to make the $225 payment to Central Charge in order to rent a car. However, the note was improperly admitted hearsay. See infra p. 442.

tion. He testified that Belfield did not meet Frazier's postal jeep on the 21st. However later that evening Hunter and Belfield rode together in the newly rented car to the Tabatabai residence. Although Hunter went to the door with Belfield's nine millimeter pistol in hand, no one answered the doorbell. They drove away. Belfield called Frazier that night to advise him that he would meet him and take the postal jeep the next day.

Between 8:00 and 9:00 a.m. on Tuesday morning, July 22, 1980, Belfield picked up Hunter in the rental vehicle. Hunter drove. Belfield told him to go to Butler's apartment. They drove into the parking lot at the rear of 738 Longfellow Street and blew the car horn. Butler first appeared at the window and then came downstairs to admit them through a rear door.[3] While inside Butler's apartment, Belfield put on a postal uniform. He also had with him a light blue pith helmet, two envelopes and the gun. Belfield asked Hunter to go outside and drive the rental car around to the front of the building. Hunter did so. Belfield, dressed in the postal uniform, came out of the apartment building, got into the car and directed Hunter to drive to the area where Massachusetts Avenue, 39th Street, and Idaho Avenue meet. When Hunter arrived there, he saw Butler drive up in his blue truck and then saw Frazier appear with the postal jeep. They all drove to Woodley Road where Belfield, with his envelopes and gun, got out and directed Frazier out of his jeep and into Butler's truck. Belfield held one hand on the gun inside one of the envelopes and acted in a manner that would make an uninformed outlooker believe that the postman was being forced into Butler's truck. Butler drove Frazier toward Baltimore. Belfield drove the post-

al jeep toward Tabatabai's house with Hunter close behind in the rental car. After Hunter and Belfield stopped for Belfield to make a telephone call, Hunter parked in the cul de sac close to the Tabatabai residence and Belfield continued on to the house.

Shortly before noon that day, Seyed Mortazavi answered the door of the Tabatabai home and confronted a man whom he presumed to be a mailman because he was wearing a postal uniform and blue helmet and was carrying a large manila envelope addressed to Tabatabai. The man insisted that Tabatabai had to sign for the delivery of mail personally. When Tabatabai himself approached the door and began to bend over to look at the package, he was shot repeatedly. The gunshot wounds caused his death almost immediately.[4] Mortazavi shut the door and called for help.

Belfield drove the postal jeep back to the cul de sac where Hunter waited in the rental car. Belfield abandoned the postal jeep and rode back to Butler's apartment with Hunter. According to Hunter's testimony, once inside the apartment Belfield put his gun in a box and left it in one of the rooms. He wrote numbers he took from a book on sheets of paper and called for information about flights from La Guardia Airport to Geneva, Switzerland. At 12:19 p.m., Trans World Airlines recorded Belfield's reservation for a 7:30 p.m. flight to Paris from the John F. Kennedy International Airport.[5] Belfield left the postal uniform and the helmet in the apartment. Telling Hunter that Butler would get rid of the gun for him, Hunter testified that Belfield left a note and a $100 bill tacked on Butler's wall and threw the rest of the note paper in the trash.[6]

---

3. Although Belfield had a key to the front door, that key would not admit him through any rear doors.

4. Hunter described Belfield's gun as a 9 millimeter. Investigators found a 9 millimeter Lugar shell casing on the front step of the Tabatabai residence.

5. At 2:16 p.m., the reservation was upgraded to first class and an additional reservation made for a Swissair flight from Paris to Geneva.

6. Among the papers recovered in a search of Butler's apartment was a note in Belfield's handwriting telling Butler to look in his tool box. A $100 bill was recovered from Butler at the time of his arrest.

When Belfield and Hunter left Butler's apartment, they threw the manila envelopes away in neighborhood trash cans and drove to the Muslim House at 5714 16th Street, N.W., where Belfield packed some personal belongings. Then they drove in the rental car to New York.

Meanwhile Butler, in his own truck, drove postman Frazier around Baltimore and eventually returned him to the Washington area, letting him out in Wheaton. Frazier called his postal supervisor from Sligo Junior High School and soon thereafter was met there by postal authorities and Federal Bureau of Investigation (FBI) agents. He first told them he had been kidnapped by two white men. Once confronted by the fact that his postal jeep had been used in an assassination, he told the truth. Although he had known all along that it was illegal for him to lend his jeep, he had assumed that the worst activity it might have been used for was a drug delivery. He wanted no part in covering up a murder.[7] The FBI began looking for Belfield and Butler.

By then Belfield had decided to avoid possible apprehension at a New York airport by fleeing to Canada. He and Hunter drove to Canada and stopped late that night at a motel near the border. The next morning, they drove farther north to the Montreal airport and checked in at the airport hotel. Belfield made inquiries about flights to Paris and Geneva. Hunter prepared to drive back to the District of Columbia. Hunter testified that Belfield gave him three notes and instructions: he was to call Abdul-Mani to tell him to report the car stolen; he was to call Saud Ramadan in Geneva to say a friend was on the way; he was to call Mehdi (Belfield's boss) to obtain $2,000. Belfield also gave Hunter $200 to deliver to Frazier, the postman.

Hunter drove the rental car south, crossing the border into the United States at Champlain, New York at 1:09 p.m. on July 23, 1980. At about 1:30 p.m. that day, FBI agents arrested appellant Butler in his truck and seized a $100 bill (and three smaller bills), an appointment book listing Abdul-Mani's phone number, and an address book including Belfield's number. Hunter heard on his car radio that Butler and the postman had been arrested. Concerned about his own freedom, Hunter called his roommate William Caffee about four times during his drive south to be sure it was safe for him to return. Caffee was a close friend, a codefendant in a pending burglary case, and someone in whom he had confided that he had had an "assignment" on July 22. Hunter arrived home later that night and was warned that police would be looking for the car. Therefore, with a friend Donnell Holmes driving the blue rental car and Hunter and Caffee following in a truck, the car was taken to southwest Washington. After wiping the car to eliminate fingerprints, they abandoned it and drove away in the truck. They stopped at Elmire and South Capitol Streets, where Hunter instructed Caffee to call Abdul-Mani to tell him to report the car stolen. After Caffee made the call, they returned to their apartment. Hunter, tired and nervous after his long drive, asked Caffee to call Mehdi for the $2000. They learned that they had to contact Yahya (also known as John Roberts) for the money. Yahya was another security guard at the Iranian Interests Section, who along with Belfield, worked for Mehdi. Before they got the money, Hunter and Caffee were arrested on unrelated charges on July 24, 1980.

On Saturday, July 26, while Butler was still in jail, Butler's sister forcibly entered Butler's apartment to get some of his things; the resident manager called the police. On Sunday, July 27, FBI agents entered Butler's apartment with a search warrant. They seized his passport, a booklet on the Islamic Revolution and other

---

**7.** Frazier pled guilty to taking an illegal gratuity on a postal vehicle and testified for the government.

leaflets and magazines. They found a pith helmet, a mailbag and a toolbox. From the trash can in the kitchen, they seized a pair of rubber gloves which bore a print left by Belfield's right middle finger and particles of gunpowder residue. In the trash they found torn scraps of paper which, when reconstructed, were found to be: directions to Tabatabai's home; a note about a car, $225, and Ali; and a note directing Butler to look in his toolbox. All the notes were in Belfield's handwriting.

Throughout this period the newspapers, radio and television stations carried stories about the Tabatabai killing. Monday morning, July 28, Abdul-Mani visited Butler at the D.C. Jail and signed the visitor's log indicating the purpose of the visit as a business consultation.

That afternoon Caffee was released from jail, and he and Hunter visited Yahya to collect the promised $2000. The next day, July 29, Hunter paid $305 in cash for overdue rent on his apartment in Forestville, Maryland.

On July 31, 1980, Abdul-Mani reported to National Car Rental and the police that the small blue Toyota he had rented on July 21 had been stolen. He reported that he had last parked it in the 1600 block of 19th Street, N.W., on July 30. The rental car, which had in fact been abandoned by Hunter in Southwest Washington a week earlier, was not recovered until August. During the investigation of this case, Abdul-Mani testified before the grand jury on June 4, 1981, denying that he had lent the rental car to Belfield or anyone else and denying that he had been reimbursed for the car.

While testifying before the grand jury, Abdul-Mani also explained that he had lent money in the past to Belfield, who was well known in his Muslim community because he felt a sense of religious obligation to respond to requests of someone who belonged to his church.

A substantial part of the government's evidence at trial consisted of the testimony of immunized accomplice Hunter. On the issue of Hunter's credibility, defense counsel introduced Hunter's many prior crimes [8] and argued that the grant of immunity encouraged him to shape his testimony according to the government's evidentiary needs.

■■■ Butler and Abdul-Mani raise several issues in this appeal. The first section of this opinion will consider Abdul-Mani's contention that the trial court improperly admitted several hearsay statements under the co-conspirator's exception to the hearsay rule. Section two will discuss the sufficiency of evidence claims raised by both appellants. Section three will consider the arguments made in reliance on the Jencks Act, 18 U.S.C. § 3500 (1982); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The question of the current viability of statutory sentencing provisions which refer to offenses punishable by death will be addressed in section four.[9]

---

**8.** Prior crimes introduced by the defense included murder, armed robbery, bank robbery, car theft, perjury, polygamy, arson, and fraudulent purchase of firearms.

**9.** Butler contends that his conviction of grand larceny and unauthorized use of a motor vehicle violates his Fifth Amendment right to protection against multiple punishments for the same offense. We agree. This court has recognized that dual convictions are improper where conviction for "[u]nauthorized use required no proof beyond that required for conviction of grand larceny," *Arnold v. United States,* 467 A.2d 136, 139 (D.C.1983). *See also Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180,

182, 76 L.Ed. 306 (1932). Therefore, we affirm appellant Butler's conviction for grand larceny, and remand his conviction for unauthorized use of a vehicle to the trial court to be vacated.

Butler argues that the trial court committed reversible error by excluding him from the voir dire of individual venire members conducted in a court anteroom under this court's interpretation of Super.Ct.Crim.R. 43(a) in *Robinson v. United States,* 448 A.2d 853 (D.C.1982). The rule enunciated in *Robinson,* however, is not to be applied retroactively. *Brodis v. United States,* 468 A.2d 1335 (D.C.1983). Thus, appellant Butler's argument cannot succeed.

## I.

■ Abdul-Mani contends that the trial court erred by admitting under the coconspirator's exception to the hearsay rule several hearsay statements of Belfield, and one of Caffee, which relate to Abdul-Mani's relationship to the rental car used by Hunter and Belfield to escape after the assassination:

(1) Hunter's testimony that Belfield "said he knew somebody with a credit card and he would take care of it," referring to the rental of the getaway car;

(2) the note in Belfield's handwriting found in Butler's apartment and offered to prove that Belfield had paid or owed Abdul-Mani $225 for the car rental;

(3) Hunter's testimony that after he asked Caffee to call Abdul-Mani to tell him Belfield said to report the car stolen, Caffee indicated that he had made the call.[10]

### A

The question of prerequisites to admission of evidence under the coconspirator's exception to the hearsay rule is an issue of first impression in this court.

■ The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Three critical concerns have led to the exclusion of hearsay evidence from the jury: "the lack of an oath by the out of court declarant; the lack of personal appearance at trial by the declarant; and the inability of opposing counsel to cross examine the declarant." *Evolution of the Coconspirator Exception to the Hearsay Rule in the Federal Courts*,

16 New Eng.L.Rev. 617, 618 (1980–81) [hereinafter cited as *Hearsay Rule*]; *see also* D. McCormick, Handbook of the Law of Evidence § 245 (2d ed. 1972). The Federal Rules also provide, however, that an admission of a party opponent is not hearsay. Fed.R.Evid. 801(d)(2). Although such admissions come within the definition of hearsay set forth in Rule 801(c), an exception has been created because "it is an equitable thing to do, consonant with a search for the truth within the confines of the adversary system." D. Binder, Hearsay Handbook 317 (2d ed. 1983). One type of admission by a party-opponent is a statement made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). "[C]oconspirators are considered agents one for another, so that the assertion of one, made in the course and scope of the conspiracy, is the admission of all." Binder, *supra*, at 344. The Supreme Court has explained that:

> The rationale for both the hearsay conspiracy exception and its limitations is the notion that conspirators are partners in crime. . . . As such, the law deems them agents of one another. And just as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the declaration of a coconspirator must be made in furtherance of the conspiracy charged in order to be admissible against his partner.

*Anderson v. United States*, 417 U.S. 211, 218 n. 6, 94 S.Ct. 2253, 2259 n. 6, 41 L.Ed.2d 20 (1974) (citations omitted); *see also Lutwak v. United States*, 344 U.S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953).

---

Butler also contends that he is entitled to a new trial because of an improper joinder of offenses. We find this contention to be without merit.

Abdul-Mani argues that the government failed to prove that he made the statement to the grand jury alleged to be perjurious. We find this contention to be without merit and affirm Abdul-Mani's conviction for perjury.

**10.** Abdul-Mani also challenged as hearsay Hunter's testimony that in Montreal Belfield "said tell him [Abdul-Mani] to report it stolen." This statement is not hearsay; rather, it is a directive offered to prove that instruction was given. *See generally* 6 Wigmore, Evidence §§ 1766, 1788 (Chadbourn rev. 1976).

■ Although the Federal Rules of Evidence do not apply in our court system, we hereby adopt FED.R.EVID. 801(d)(2)(E) as controlling in this jurisdiction.[11] Under this holding a coconspirator's out-of-court assertions may be admitted as nonhearsay evidence in the courts of this jurisdiction only if the prosecution proves that (1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy. FED.R.EVID. 801(d)(2)(E).

■ We also conclude, consonant with the approach of all the federal circuits, that under FED.R.EVID. 104(a), the judge should determine the ultimate admissibility of coconspirators' statements.[12] This is the better approach, because a "rule that puts the admissibility of coconspirator statements in the hands of the jury does not avoid the danger that the jury might convict on the basis of these statements without first dealing with the admissibility question.... As a result, such statements should be evaluated by the trained legal mind of the trial judge." *United States v. James,* 590 F.2d 575, 579 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). *Cf. Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

After placing the admissibility decision in the hands of the judge two further issues must be confronted: the type of evidence to be considered in determining whether a conspiracy exists; and the standard of proof prosecutors must satisfy and the timing of the admissibility decision.

The choice to be made in determining the type of evidence a judge may consider in making the admissibility decision is whether all proffered evidence may be regarded, or whether only independent nonhearsay evidence may be considered.[13] Prior to Rule 104(a), the Supreme Court in *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), "prohibited judges from considering the coconspirator statements themselves when determining the availability of the coconspirator hearsay exception to those statements. Under the *Glasser* requirement, judges may only consider independent evidence of the conspiracy in determining the admissibility of out of court statements of coconspirators." *Coconspirator Exception, supra* note 12, at 134. Rule 104(a), however, appears to allow judges to consider hearsay and other inadmissible evidence in admissibility determinations because it frees the judge from the limitations of the Rules of Evidence except as regards privileges. FED.R.EVID. 104(a).

■ The circuit courts are divided as to whether Rule 104(a) overrules or is compatible with *Glasser.* We agree with those

---

**11.** (d) Statements which are not hearsay. A statement is not hearsay if—

\* \* \* \* \* \*

(2) Admission by party-opponent. The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. FED.R.EVID. 801(d)(2)(E).

**12.** "Subdivision (a) of Federal Rule 104 imposes upon the judge the duty to decide preliminary questions of fact dependent on the competency of the evidence. Under rule 104(b) the jury is to determine preliminary questions of relevancy dependent upon the fulfillment of a condition of fact." *Inconsistencies in the Federal Circuit Courts' Application of the Coconspirator Exception,* 39 WASH. & LEE L.REV. 125, 131 (1982) [hereinafter *Coconspirator Exception*]. Rule 104 does not itself dictate whether the judge or jury should decide the ultimate admissibility of coconspirator statements. In *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977), the First Circuit found that Rule 104(a) required the judge to make such admissibility decisions. The other circuits have since adopted the First Circuit approach.

**13.** A third alternative is consideration of all evidence, regardless of its hearsay nature, except the specific hearsay evidence for which admission is sought. *See United States v. James, supra,* 590 F.2d at 580–81. In *James,* the Fifth Circuit sought to combine the requirements of *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and Rule 104(a), but the resulting rule presents a task more complicated than necessary for the trial judge without, in our view, compensating advantages.

jurisdictions which mandate consideration of only the independent nonhearsay evidence in the admissibility determination. *E.g., United States v. Cambindo Valencia*, 609 F.2d 603, 631 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Macklin*, 573 F.2d 1046, 1048 (8th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978); *United States v. Andrews*, 585 F.2d 961, 964 (10th Cir.1978); *United States v. Dixon*, 562 F.2d 1138, 1141 (9th Cir.1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1495, 55 L.Ed.2d 521 (1978); *United States v. Stroupe*, 538 F.2d 1063, 1065 (4th Cir.1976); *United States v. Buschman*, 527 F.2d 1082, 1085 (7th Cir. 1976); *United States v. Hopkins*, 518 F.2d 152, 156 (3d Cir.1975); *see also United States v. Haldeman*, 181 U.S.App.D.C. 254, 341 n. 246, 559 F.2d 31, 118 n. 246 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (decided before enactment of Rule 104 but remains persuasive authority; *see United States v. Jackson*, 201 U.S.App.D.C. 212, 219 & n. 34, 627 F.2d 1198, 1215 & n. 34 (1980)). This approach ensures the reliability of coconspirator's statements admitted at trial by determining that sufficient corroborating evidence of a conspiracy exists. It also guards against the danger of "bootstrapping," *i.e.*, using hearsay evidence to justify its own admission. *See Glasser v. United States, supra*, 315 U.S. at 74–75, 62 S.Ct. at 467.[14]

■ The circuit courts also vary regarding the standard of proof the prosecution must satisfy to prove the existence of a conspiracy. At common law, hearsay was admitted against a defendant if the prosecution established a prima facie case of conspiracy. *Hearsay Rule, supra* at 628. The prima facie test has been rejected by all but one of the circuits.[15] As the First Circuit reasoned in *United States v. Petrozziello, supra*, 548 F.2d at 23:

> This standard makes sense when the jury has the last word; the judge should refuse to admit a co-conspirator's hearsay only when no reasonable jury could find that there was a conspiracy. But rule 104(a) requires that questions of admissibility be "determined" by the judge, and finding a prima facie case is not the same as "determining" that a conspiracy existed. A higher standard is implicit in the judge's new role.

Some jurisdictions use the substantial independent evidence standard at some point in the formula guiding the admissibility decision.[16] Substantial independent evidence has been defined as "more than a scintilla," or an amount, "less than the weight of the evidence," that a reasonable mind would find sufficient to support a conclusion. *United States v. Petersen, supra* note 16, 611 F.2d at 1330 n. 5. It has also been described as demanding "enough merit in the prosecution's case to risk the admission of hearsay that might later prove inadmissible...." *United States v. Grassi, supra* note 16, 616 F.2d at 1301.

This standard may or may not provide an accused with more protection than does the prima facie standard. It does, however, fall short of adequately protecting the accused against the risks of unreliable evidence. The protection it offers is significantly less than that of the standard

---

**14.** The First Circuit found that Rule 104(a) overruled *Glasser, supra*, "to the extent that it held that the statement seeking admission cannot be considered at all in making the determination whether a conspiracy exists." *United States v. Martorano*, 557 F.2d 1, 12 (1st Cir.), *reh'g denied*, 561 F.2d 406 (1st Cir.1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). We reject this conclusion, and as a matter of state law, adhere to the requirements of *Glasser*.

**15.** *See United States v. Batimana*, 623 F.2d 1366, 1368 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980).

**16.** *See United States v. Jackson*, 627 F.2d 1198, 1219 (D.C.Cir.1980); *United States v. Gantt*, 617 F.2d 831, 845–46 (D.C.Cir.1980); *United States v. Grassi*, 616 F.2d 1295, 1300–01 (5th Cir.1980); *United States v. Petersen*, 611 F.2d 1313, 1330–31 (10th Cir.), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980); *United States v. James, supra*, 590 F.2d at 581.

adopted by a majority of the circuits—the preponderance of the evidence standard.[17] *See United States v. Kendricks,* 623 F.2d 1165, 1167–68, 1168 n. 5 (6th Cir.1980); *United States v. Provenzano,* 620 F.2d 985, 999 (3d Cir.1980); *United States v. Baykowski,* 615 F.2d 767, 771 (8th Cir. 1980); *United States v. Santiago,* 582 F.2d 1128, 1134 (7th Cir.1978); *United States v. Jones,* 542 F.2d 186, 203 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976); *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). The preponderance of the evidence standard requires a weighing of the prosecution's evidence against that of the defense before admissibility can be determined. While the preponderance standard adequately protects the accused against the risk of admitting unreliable evidence, it also requires, if administered in a conceptually consistent manner, delay of the admissibility decision until the close of all the evidence. *Coconspirator Exception, supra,* at 143. This circumstance forces the court into one of two options: conditional admission of the hearsay evidence at trial with the incumbent risk of prejudice to the defendant, or the practical inconvenience of a preliminary mini-trial to enable the judge to determine admissibility prior to trial. It must be recognized that where the hearsay is conditionally admitted, there is built into the decision-making process a pressure to find the hearsay admissible in order to avoid the necessity of a mistrial.

■■■■ To avoid the conceptual and practical difficulties inherent in the preponderance of the evidence standard, yet provide the same level of protection for the accused, we choose to express our state law holding by ruling that the existence of the conspiracy must be proved to be "more likely than not." *Compare United States v. Petrozziello, supra,* 548 F.2d at 23. Although we express our standard differently, the quantum of proof the prosecution must satisfy remains identical to that required by the preponderance of the evidence standard. Unlike the preponderance test, however, our standard does not require a weighing of all the evidence. Therefore, the trial judge should make the admissibility determination during the prosecution's evidence. By timing the determination at this point in the proceedings, the pressure favoring admissibility in logical application of the preponderance standard is eliminated. The one-step admissibility determination this approach facilitates also avoids the impracticality of the mini-trial necessary to unconditional admission under the preponderance standard. Additionally, this approach avoids the conceptual difficulty of determining the admissibility of part of the government's case based on the content of the defense case.

■■■■ This one-step admissibility decision will pertain to the great majority of cases, but in very unusual circumstances the trial judge retains discretion to conditionally admit hearsay evidence subject to eventual establishment of a conspiracy by independent evidence. Conditional admission would be appropriate where, for example, an out-of-state government witness whose testimony contained both independent and hearsay evidence would be subjected to undue hardship if forced to delay giving the hearsay portion of her testimony. This exception would allow the judge to respond

---

**17.** The D.C. Circuit directs use of the substantial independent evidence standard to determine conditional admission of hearsay under the coconspirator's exception; substantial independent evidence is defined as something less than a prima facie case. If the prosecutor satisfies this quantum of proof by the end of the case, the trial court must also decide whether the case should be submitted to the jury using the standard of *Curley v. United States,* 81 U.S.App.D.C.

389, 392, 160 F.2d 229, 232 (D.C.Cir.) (prima facie test), *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). *United States v. Jackson, supra,* 201 U.S.App.D.C. at 233–34, 627 F.2d at 1219–20. We reject this approach, believing it lowers the barrier against unreliable evidence beyond the level necessary for fairness. The highest standard in the D.C. Circuit's calculus is the prima facie test, and this test can be met by the hearsay itself. *Id.*

to such special circumstances, but must not be permitted to swallow the general rule.

## B

In the instant case, the trial court conditionally admitted the hearsay. After the close of the prosecution's case, the court ruled that the prosecution had proven the existence of a conspiracy by substantial independent evidence, and allowed the statements to remain in evidence. We conclude that the coconspirator's statements should not have been admitted. The only independent nonhearsay evidence presented by the government tending to establish a conspiracy involving appellant Abdul-Mani was (1) Abdul-Mani's visit to Butler at the jail, and (2) his denials before the grand jury regarding the rental car. Standing alone, this evidence is not sufficient to make the existence of a conspiracy "more likely than not." Applying the harmless error test of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to the improperly admitted hearsay, it cannot be said "that the judgment was not substantially swayed by the error ...." *Id.* at 765, 66 S.Ct. at 1248. Therefore, Abdul-Mani's conviction as an accessory after the fact cannot stand.[18]

Although we reverse on this ground, we must also address Abdul-Mani's contention of evidentiary insufficiency because of the double-jeopardy provision of the Fifth Amendment. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We do so in the following section.

## II.

Abdul-Mani contends that the trial court erred in denying his motion for judgment of acquittal on the accessory after the fact charge because the evidence is insufficient to show that he knew Belfield had participated in the Tabatabai murder or that his actions after the murder were of any assistance to Belfield. Having reviewed the government's evidence on the accessory charge, using the proper standards,[19] we agree with Abdul-Mani's contention that there is insufficient evidence from which a jury could have found him guilty beyond a reasonable doubt. Accordingly, we reverse Abdul-Mani's conviction as an accessory after the fact of first-degree murder on this ground as well.

Because of an absence of a statutory definition of the elements of accessory after the fact, we turn to the common law. "Under the common law, '[a]n accessory after the fact is one who, knowing a felony to have been committed by another, receives, relieves, comforts, or assists the felon in order to hinder the felon's apprehension, trial, or punishment.'" *Clark v. United States, supra,* 418 A.2d at 1061 (quoting *Skelly v. United States,* 76 F.2d 483, 487 (10th Cir.) (citations omitted), *cert. denied,* 295 U.S. 757, 55 S.Ct. 914, 79 L.Ed. 1699 (1935).[20] Therefore, to sustain

---

18. Because we find that the hearsay statements were improperly admitted under the coconspirators' exception to the hearsay rule, it is unnecessary to reach appellant's argument that admission of the statements violated his Sixth Amendment right to confront adverse witnesses.

19. In evaluating Abdul-Mani's claim of insufficiency of evidence, we "review the evidence in a light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Sousa v. United States,* 400 A.2d 1036, 1043 (D.C.1979) (quoting *Byrd v. United States,* 388 A.2d 1225, 1229 (D.C.1978)), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). "We are also mindful that 'circumstantial evidence is not considered inferior to direct evidence in any respect.'" *Clark*

*v. United States,* 418 A.2d 1059, 1060 (D.C.1980) (quoting *United States v. Rux,* 412 F.2d 331, 333 (9th Cir.1969) (citations omitted)).

However "[t]o sustain a conviction the evidence need be 'such evidence that reasonable persons *could* find guilt beyond a reasonable doubt.'" *United States v. Harris,* 140 U.S.App. D.C. 270, 284 n. 41, 435 F.2d 74, 88 n. 41 (1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971) (quoting *Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967) (emphasis in original)).

20. D.C.Code § 22–106 (1981) has modified the common law definition "to the extent that one can be an accessory after the fact to any criminal offense subject to a fine or punishment rather than connecting the offense to felonies." *Clark v. United States, supra.*

a conviction of accessory after the fact, the government's evidence must establish that Abdul-Mani had knowledge of Belfield's participation in the murder and that with that knowledge Abdul-Mani aided or assisted Belfield with specific intent to help him evade apprehension or punishment. *See* Criminal Jury Instructions for the District of Columbia, No. 4.01 (3d ed. 1978).

On the issue of Abdul-Mani's "knowledge" that Belfield had participated in the murder of Tabatabai, the government introduced evidence that local newspapers carried stories about the murder between July 22, the date of the murder, and July 31, 1980, the date on which Abdul-Mani reported the rental car stolen. An FBI agent testified as to the nature of these news accounts:

Q: Now Special Agent Stieler, sir, have you had an occasion to review any records maintained by the Federal Bureau of Investigation reflecting any newspaper coverage of the Tabatabai killing?

A: Yes, sir.

Q: Bearing the dates of July 23rd, 1980 and July 31, 1980?

A: Yes, sir.

Q: And what type of—what did you review specifically, sir?

A: When we have a case of this nature, we keep a file on press clippings.

Q: Now can you tell the ladies and gentlemen about the nature of the press coverage of the Tabatabai killing, the number of such press accounts and the papers in which such accounts occurred *where specifically David Belfield was identified*?

A: From my review *he was identified* on July 23rd, 1980, in the evening edition of the Washington Star and then on the 24th through the 31st there were numerous articles ap-

pearing in the Washington Post, Baltimore Sun, Washington Star, Baltimore News American, as well as the local newspapers such as the Montgomery County Journal.

Q: What were the dates of those particular articles?

A: July 24th, July 25th.

Q: What paper was that?

A: That was the Post, the Sun, the Star and the News American.

Record at 1640–42 (emphasis added). The government introduced Abdul-Mani's grand jury testimony that he "read the papers like everyone else." Record at 1592.

The government also introduced evidence that on the morning of July 28, 1980, Abdul-Mani visited appellant Butler at the D.C. Jail. He logged the purpose of the visit as a business consultation. From this evidence the jury was asked to infer that Abdul-Mani had actual knowledge that Belfield killed Tabatabai (*i.e.*, that Abdul-Mani read newspaper reports identifying Belfield as the assassin and/or that appellant Butler told Abdul-Mani that Belfield murdered Tabatabai).[21]

▬ The testimony introduced by the government concerning the newspaper accounts of the Tabatabai killing indicated only that Belfield had been "identified." No other details were given (*e.g.*, the role he allegedly played, the source for the stories, or evidence leading to the identification). Further, there is no showing that Abdul-Mani actually read these reports. Abdul-Mani's grand jury testimony that he "read the newspapers, like everybody else," does not show what newspapers he read, or when he read them.

Likewise, Abdul-Mani's visit to appellant Butler at the D.C. Jail does not support any inference as to the content of their conversation. Any such assumption would be

---

**21.** The dissent asserts that *Clark v. United States, supra,* 418 A.2d at 1061, leaves unclear the question of whether "personal knowledge" is required to sustain a conviction of accessory after the fact. However, *Clark* forthrightly states that "... personal knowledge, while often not susceptible of direct proof, is required for a conviction of being an accessory after the fact." *Id.*

pure speculation. We therefore conclude that adequate proof of guilty knowledge was not presented.[22]

As regards Abdul-Mani's aid or assistance to Belfield, Abdul-Mani argues that his stolen car report could not have assisted Belfield's escape because the escape was complete by the time of the report. In response, the government argues that by delaying the report Abdul-Mani gave Belfield extra time to conceal himself. This argument puts the government in the position of contending that Abdul-Mani's guilt as an accessory arises due to his not having engaged in illegal action—making the false report—at an earlier time. Certainly Abdul-Mani had no duty to make a false stolen car report at any time. In any event, as the trial court noted, and as the government concedes in its brief,[23] Abdul-Mani's report on July 31, 1980, could not have helped Belfield in his escape, because by the time of the report Belfield had successfully fled to Iran.

Although a defendant's specific intent to act so as to assist a principal in escape is relevant to proof of the offense of accessory after the fact, it is not alone sufficient. The definition of accessory after the fact also requires assistance or aid designed to hinder apprehension, trial or punishment. *See Clark v. United States, supra,* 418 A.2d at 1061. Just as a "person cannot aid or abet a crime which has already been completed," *Roberts v. United States,* 416 F.2d 1216, 1221 (5th Cir.1969), a person cannot assist a criminal to evade apprehension or punishment where the escape has already been effected. By way of

illustration, could one assist the escape of a felon by an overt act done at a time the felon was dead or had already been arrested without the knowledge of the one seeking to help him evade apprehension? We think not. As the Court of Criminal Appeals of Texas has held, the aid rendered must be of such a character as to "enable elusion of *present* arrest and prosecution." *Easter v. Texas,* 536 S.W.2d 223, 226 (1976) (emphasis added).

In the vast majority of cases in which a defendant's conviction as an accessory after the fact is affirmed, the facts of the offense reveal that the accessory's assistance did in some way help the principal evade apprehension. *See, e.g., United States v. McLennan,* 672 F.2d 239 (1st Cir.1982); *United States v. Ferreboeuf,* 632 F.2d 832 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 368 (1981); *United States v. Balano,* 618 F.2d 624 (10th Cir.1979), *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); *United States v. Hayes,* 589 F.2d 811 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). Even in those few cases where the assistance rendered was not in any way effective, the possibility existed that the aid might have facilitated the offender's escape. *See, e.g., United States v. Honesty,* 148 U.S.App.D.C. 255, 459 F.2d 1279 (1971).[24]

If we assume, for the sake of argument only, that Abdul-Mani had knowledge of Belfield's participation in the assassination, the evidence might support a charge of misprison of felony. D.C.Code

---

22. The government contends that Abdul-Mani's knowledge of Belfield's guilt could be inferred from all the evidence presented against Abdul-Mani. Included in that evidence was the improperly admitted hearsay discussed *supra.* The other evidence was Abdul-Mani's rental of the blue Toyota, Belfield's statement directing Hunter to tell Abdul-Mani to report the car stolen, the false stolen car report, and Abdul-Mani's false testimony to the grand jury. However, the only evidence which tends to prove Abdul-Mani's *intent* to aid Belfield is Hunter's improperly admitted hearsay testimony that

Caffee indicated he'd told Abdul-Mani to report the car stolen. *See* p. 442, *supra.*

23. Government Brief at 61.

24. The dissent asserts that this opinion focuses on the "success or failure which the principal encounters in seeking to escape" as determinative of whether 'assistance' has been rendered. To the contrary, as the cases cited in the text demonstrate, the ultimate success of the offender's efforts to escape is irrelevant to a finding that assistance has been rendered.

§ 4–175 (1981). This offense makes unlawful the aiding or assisting of any person suspected of crime to escape full judicial examination by the withholding of any information about a felony or other unlawful act. *Id.* However, this offense must be distinguished from the offense of accessory after the fact, which requires an act of assistance by the alleged accessory. *Skelly v. United States, supra.* The evidence does not show any action of Abdul-Mani's which aided Belfield's evasion of law enforcement authorities.

We conclude that the evidence in this case is insufficient to support the inference that Abdul-Mani had personal knowledge of Belfield's participation in the murder. Likewise, the evidence is not such that a reasonable jury could find beyond a reasonable doubt that Abdul-Mani's false stolen car report assisted Belfield in evading apprehension. Therefore, Abdul-Mani's motion for judgment of acquittal on the charge of accessory after the fact of first-degree murder should have been granted by the trial court.

██ Appellant Butler also contends that the evidence is insufficient to support his conviction as accessory after the fact. Contrary to our conclusion regarding Abdul-Mani, we find that the evidence against Butler is sufficient to support the jury's verdict. Therefore we affirm Butler's conviction as accessory after the fact to first-degree murder.

The government introduced ample evidence on the issues of Butler's knowledge of Belfield's participation in the assassination and Butler's assistance to Belfield. The evidence showed that Butler knew Belfield; in fact, they knew each other well enough that Belfield had a key to Butler's apartment. Prior to the homicide, Belfield changed into the postal uniform in Butler's apartment while Butler was present. Butler participated in Belfield's scheme by driving postman Frazier to and around Baltimore while the assassination took place.

Belfield returned to Butler's apartment after the murder. According to Hunter's testimony, Belfield put his gun in a box in one of the rooms in Butler's apartment, and left a note and a $100 bill tacked on the wall. Butler was arrested the day after the murder and was found to have a $100 bill in his possession. Three days later, Butler's sister forcibly entered Butler's apartment to get some of his things. The following day the FBI searched the apartment. Among other things, they found a mailbag, a pith helmet, a toolbox, and a pair of rubber gloves bearing Belfield's fingerprint and particles of gunpowder residue. They also found a note saying— "Ahmed, look in your toolbox. Keep the difference over what your brother charges." [25]

The evidence presented by the government was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Butler had knowledge of Belfield's participation in the assassination. It was also sufficient to support a finding that Butler assisted Belfield—by driving Frazier around Baltimore, providing access to his apartment for Belfield's use, and/or by disposing of Belfield's gun. We conclude, therefore, that the evidence was such that reasonable persons could find guilt beyond a reasonable doubt. *Crawford v. United States, supra,* 126 U.S.App.D.C. at 158, 375 F.2d at 334.

### III.

Prior to his testimony in this case, Hunter also testified as a government witness in the case of *United States v. Jimmie Franklin McEachern* in the Eastern District of Virginia. That testimony occurred approximately one month after the signing of his immunity agreement. When appellants in the instant case filed discovery motions requesting pretrial disclosure of, among other things, all of Hunter's statements relating to the indicted offenses, the

**25.** Although no gun was found, the government asked the jury to infer that the first part of this note referred to the gun mentioned by Hunter, and the second part referred to the $100.

government did not produce those portions of Hunter's testimony to the Virginia federal grand jury which related to his involvement in the Tabatabai murder. Consequently, that testimony was not introduced at trial.

Butler argues that the government's failure to disclose those portions of Hunter's grand jury testimony in the case of *United States v. McEachern* in the Eastern District of Virginia which concerned the Tabatabai assassination constituted a violation of the government's obligations under the Jencks Act, 18 U.S.C. § 3500 (1982); *Brady v. Maryland, supra,* and *Giglio v. United States, supra.*[26] Butler urges that the trial court therefore erred in denying his motion for a new trial based on newly discovered evidence.[27]

The trial court found that Hunter's grand jury testimony in *United States v. McEachern* regarding the plot to assassinate Mr. Tabatabai should have been disclosed to defendants at trial as Jencks material. The testimony satisfied the four prerequisites of the Jencks Act:

(1) the material must be in the possession of the government;

(2) the defense must request the material;

(3) the material must constitute a "statement" as defined at 18 U.S.C. § 3500(e);[28] and

(4) the statement must relate to the subject matter of the witness' direct testimony.[29]

18 U.S.C. § 3500.

■ "Since courts cannot 'speculate whether [Jencks material] could have been utilized effectively' at trial, *Clancy v. United States,* 365 U.S. 312, 316 [81 S.Ct. 645, 648, 5 L.Ed.2d 574] (1969), the harmless-error doctrine must be strictly applied in Jencks Act cases." *Goldberg v. United States,* 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976) (brackets in 425 U.S.). Therefore, for the conviction to stand, the court must be "sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States, supra,* 328 U.S. at 764, 66 S.Ct. at 1248.

■ Upon strictly applying the harmless error standard, the trial court found that the error did not influence the jury, or had only a very slight effect. While the undisclosed testimony revealed that Hunter would—and did—lie after receiving his immunity agreement, the trial court determined that the extent to which this disclosure could have undermined Hunter's credibility would not be sufficient to affect the verdict given the strength of the case against Butler. The government presented substantial corroborative evidence detailing Butler's involvement with the assassination plot (*e.g.,* testimony of postman Frazier),

---

**26.** We need not consider Abdul-Mani's similar contentions because his conviction of accessory after the fact is being reversed on other grounds.

**27.** A new trial motion based on newly discovered evidence "is designed to afford relief where, despite the fair conduct of the trial, it later clearly appears to the trial judge that, because of facts unknown at the time of trial, substantial justice was not done." *United States v. Johnson,* 327 U.S. 106, 112, 66 S.Ct. 464, 467, 90 L.Ed. 562 (1946).

**28.** 18 U.S.C. § 3500:

(e) The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement.

(3) A statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

**29.** Hunter's grand jury testimony contradicted his trial testimony regarding (1) whether he had been involved in Tabatabai's assassination; (2) whether he was a follower of Khomeini and the "Islamic Revolution;" and (3) his response to Belfield's request for assistance in the assassination scheme.

making it possible "to conclude that substantial rights were not affected," *id.* at 765, 66 S.Ct. at 1248, by the nondisclosure of the Jencks material.[30] Because the trial court's determination was not clearly erroneous,[31] its denial of Butler's motion for a new trial based on the Jencks Act violation must be affirmed.

The trial court found the sections of Hunter's grand jury testimony in issue not to be *Brady* material, and concluded that a new trial was not in order based on any *Brady* violation. Even if the testimony in issue were found to be *Brady* material, no justification for a new trial would arise, as "there is no reasonable doubt about [Butler's] guilt whether or not the additional evidence is considered." *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). It simply cannot be said that introduction of Hunter's grand jury testimony would have affected the outcome of the trial. *Id.* at 104, 96 S.Ct. at 2397.[32]

### IV.

Appellant Butler was sentenced as an accessory after the fact to first-degree murder under D.C.Code § 22–106 (1981) to a term of imprisonment of not less than six and not more than twenty years. Section 22–106 establishes a twenty year maximum sentence for those convicted as accessories to "any crime punishable by death." [33] Butler contends that this statutory provision has no application following *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and repeal of the death penalty in the District of Columbia. He urges that D.C.Code § 22–107 (1981) must apply, resulting in a maximum sentence of five years.[34]

We find that the phrase "crime punishable by death" in § 22–106 is still viable as a shorthand reference to a category of particularly serious offenses in which first-degree murder is included.

Following decisions holding death penalty statutes unconstitutional,[35] courts have relied on legislative intent in interpreting other statutes or rules which rely upon the notion of a "capital offense." The courts have followed the reasoning of the Fourth Circuit in *United States v. Watson*, 496 F.2d 1125 (4th Cir.1973). In *Watson*, the court held that notwithstanding *Furman, supra,* the defendant had an absolute right to two attorneys under the federal statute authorizing counsel for those indicted for capital crimes, 18 U.S.C. § 3005 (1969). The court reasoned that because it was unable to say that "imposition of the death

---

30. Because no reasonable likelihood exists that the nondisclosure could have affected the outcome of the jury, there is likewise no *Giglio* violation present. *See Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. at 766.

31. "[A] 'clearly erroneous' standard is the appropriate measure by which we are to review the trial court's conclusions both as to whether ... the requested material falls within the reach of the Act, and, if so, whether the circumstances warrant the imposition of any sanction for the government's failure to produce the document." *March v. United States,* 362 A.2d 691, 702 (1976).

32. Butler also contends that there is a reasonable likelihood that nondisclosure of Hunter's other criminal conduct and an alleged mischaracterization of Hunter's immunity agreement might have so affected the jury's findings that a new trial is warranted. We find these contentions to be unpersuasive.

33. Whoever shall be convicted of being an accessory after the fact to any crime punishable by death shall be punished by imprisonment for not more than 20 years. Whoever shall be convicted of being accessory after the fact to any crime punishable by imprisonment shall be punished by a fine or imprisonment, or both, as the case may be, not more than one-half the maximum fine or imprisonment, or both, to which the principal offender may be subjected. D.C.Code § 22–106 (1981).

34. Whoever shall be convicted of any criminal offense not covered by the provisions of any section of this Code, or of any general law of the United States not locally inapplicable in the District of Columbia, shall be punished by a fine not exceeding $1,000 or by imprisonment for not more than 5 years, or both. D.C.Code § 22–107 (1981).

35. *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); *Furman v. Georgia, supra.*

penalty was the *sole* reason why Congress gave an accused the right to two attorneys," *Watson, supra,* 496 F.2d at 1128, *Furman* did not effect a judicial repeal of § 3005. *Id.* The court discussed the possibility that the special protection was offered because of the complexity and seriousness of capital crime cases.

Courts following the reasoning of *Watson* generally conclude that a provision relying on the notion of "capital offense" remains valid if it was enacted in response to the seriousness of the offense, but no longer has application if it served only to ensure special protections for offenders facing the finality of death.[36]

This analysis of legislative intent is undertaken by the courts only when the legislature has failed to indicate whether it still regards the underlying substantive offense as a "capital offense." Where the legislature has acted so as to indicate it no longer considers a particular crime a "capital offense," such analysis is not necessary.

For example, in *United States v. Brown,* 422 A.2d 1281, 1283–85 (D.C.1980), this court found that by reducing the maximum penalty for rape from death to life imprisonment while the death penalty remained a viable alternative,[37] Congress intended to remove rape from the category of capital offenses. Similarly, federal courts have held that where the death penalty remained in the United States Code[38] and Congress

removed the death penalty provision from the kidnapping statute, Congress no longer intended for kidnapping to be considered a capital offense for which there was an unlimited statute of limitations and other procedural protections. *United States v. Provenzano,* 423 F.Supp. 662 (S.D.N.Y.1976), *aff'd,* 556 F.2d 562 (2d Cir.1977). *See also United States v. Massingale,* 500 F.2d 1224 (4th Cir.1974).

When the District of Columbia reduced the maximum penalty for first-degree murder from death to life imprisonment in 1981, the death penalty itself was repealed. The death penalty statute in the District of Columbia had already been judicially invalidated. *See Furman v. Georgia, supra; United States v. Stokes, supra* note 37, 365 A.2d at 616 n. 4.

This downgrading of the punishment for first-degree murder cannot be interpreted as a downgrading of the status of this crime as the most serious of offenses. It remains an offense solidly within that category of grave offenses referred to in a shorthand manner as crimes punishable by death in D.C.Code § 22–106 (1981).

Section 22–106, which establishes a twenty year maximum sentence for accessories after the fact to crimes punishable by death, seeks to impose the most strict of punishments on accessories to the most serious of crimes. To conclude that repeal of the death penalty was intended to invali-

---

**36.** A majority of courts have found that defendants who do not face the death penalty are no longer entitled to special procedural safeguards such as two court-appointed attorneys. *United States v. Dufur,* 648 F.2d 512, 514–15 (9th Cir. 1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1378, 67 L.Ed.2d 355 (1981); *United States v. Shepherd,* 576 F.2d 719, 727–29 (7th Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978); *United States v. Weddell,* 567 F.2d 767, 770 (8th Cir.1977), *cert. denied,* 436 U.S. 919, 98 S.Ct. 2267, 56 L.Ed.2d 761 (1978). *Contra United States v. Watson, supra.* However, courts have continued to apply the unlimited statute of limitations (18 U.S.C. § 3148 (1982)) and more restrictive bail provisions (18 U.S.C. § 3148 (1982)) to capital offenses with unconstitutional death penalty provisions, reasoning that these provisions are related to the serious nature of

the offense charged. *E.g., United States v. Kennedy,* 618 F.2d 557 (9th Cir.1980); *United States v. Helmich,* 521 F.Supp. 1246, 1247–51 (M.D.Fla. 1981), *aff'd,* 704 F.2d 547 (7th Cir.1983).

Although other courts have reached different conclusions, the decisions are still based on legislative intent. *See* Annot., 71 A.L.R.3d 453 (1976).

**37.** "The death penalty provision [in the District of Columbia Code] was invalidated as a result of the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)." *United States v. Stokes,* 365 A.2d 615, 616 n. 4 (D.C.1976). Congress reduced the maximum penalty for rape from death to life imprisonment in 1970.

**38.** 18 U.S.C. § 3566 (1982).

date § 22–106 would disregard the lawmakers' consistent treatment of murder as the most serious offense, and would mandate absurd results, *i.e.,* a five year maximum sentence for accessories to first-degree murder, while a fifteen year maximum remains for accessories to first-degree burglary. *See* D.C.Code §§ 22–1801(a), –106 (1981). Where "a literal interpretation of the statute would lead to an absurd result, the court will follow the legislative intent . . . ." *Mulky v. United States,* 451 A.2d 855, 857 (D.C.1982).

We conclude that the phrase "crime punishable by death" in D.C.Code § 22–106 is a legitimate shorthand reference to particularly serious offenses among which first-degree murder prominently ranks. The trial court did not err in regarding twenty years as the allowable maximum in sentencing appellant.

*Affirmed in part; reversed in part; remanded.*

PRYOR, Associate Judge, concurring in part and dissenting in part:

I concur in parts I–A, III, and IV of the majority's opinion. I respectfully dissent from parts I–B and II, however.

With respect to part II of the majority's opinion, considering Abdul-Mani's accessory after the fact conviction, I would hold—applying the familiar test regarding sufficiency of the evidence, *Crawford v. United States,* 126 U.S.App.D.C. 156, 375 F.2d 332 (1967)—that there was ample evidence from which reasonable jurors could conclude, beyond a reasonable doubt, that appellant Abdul-Mani was guilty of the offense charged.

The common law, as modified by D.C. Code § 22–106 (1981), requires the government to prove that the alleged accessory knew that the principal committed a crime and that he rendered assistance in order to hinder the latter's apprehension, trial or punishment. *Clark v. United States,* 418 A.2d 1059, 1061 (D.C.1980).

In this case, the government's evidence consisted of accomplice Hunter's testimony outlining the planning and execution of the assassination; the circumstances surrounding the relationship between the principal Belfield and Abdul-Mani; Abdul-Mani's rental of the car upon Belfield's request; the "highly publicized" nature of the assassination including the fact that several early reports identified Belfield; Abdul-Mani's private visit to accomplice Butler in the D.C. Jail shortly after the assassination; Belfield's final instruction to accomplice Hunter to tell Abdul-Mani to report the car stolen; Caffee's call to Abdul-Mani forwarding Belfield's order; Abdul-Mani's false report that the car had been stolen and his false statements concerning where he had last left the car; and finally, Abdul-Mani's perjury before the grand jury.

From this evidence, the jury could have concluded reasonably that Abdul-Mani knew that Belfield had participated in the Tabatabai killing when he reported the car stolen. The evidence is admittedly circumstantial, but the heavy media coverage of the crime, coupled with Abdul-Mani's admission that he "read the papers like everyone else," and his private and hurried conference with accomplice Butler on July 28, permits the reasonable inference of Abdul-Mani's knowledge.[1] This inference is all that is required, of course, to send the question to the jury.

Similarly, I think that appellant's false report that the rental car had been stolen could, under the circumstances, be viewed by a reasonable jury as a deliberate effort "to hinder the felon's apprehension."

---

1. Although *Clark v. United States, supra,* indicated that the alleged accessory did not have "personal knowledge" of the principal's crime, it is not clear from that opinion that such knowledge is required to sustain a conviction. The common law of accessory after the fact, from which our own jurisprudence is derived, *id.* at 1061, requires only that the accessory possess information sufficient to give him reasonable grounds to believe that the principal had committed a felony. *See State v. Lynch,* 79 N.J. 327, 337–39, 399 A.2d 629, 634 (1979). I believe that this was established by the government's evidence in the instant case.

It is apparent that I differ with the majority on two aspects of this question. Initially, I do not read the prior decisions to hold that the government must prove that the accessory's assistance did, in fact, help the principal make good his escape. It is enough that the accused knowingly took overt steps with a view—successful or not—toward rendering aid. *See United States v. Honesty,* 148 U.S.App.D.C. 255, 459 F.2d 1279 (1971) (where a murder suspect was tracked by police officers to an apartment shared with his wife, she unsuccessfully blocked a bathroom door to help him elude police; the court concluded that her overt acts served as an adequate basis for conviction). Thus, I submit that it is the character or nature of the accessory's act (along with the requisite intent) which is paramount, not the success or failure which the principal encounters in seeking to escape.[2] *See Maddox v. Commonwealth,* 349 S.W.2d 686, 689 (Ky.1961) (any assistance given to hinder apprehension of felon is sufficient to support accessory conviction, although certain types of acts, such as the giving of charity or not disclosing the crime, do not as a matter of law tend to hinder apprehension).

A second area of disagreement touches the legal concept of impossibility. My review of the record does not lead me to conclude that, when Abdul-Mani reported the car stolen on July 31, 1980, Belfield had already "effected" his escape. I do not think that the government concedes this point on appeal. Belfield was last seen in Montreal on July 23. The fairest reading of the record holds that there is no evidence showing Belfield's whereabouts after that date.

This notwithstanding, I think it unwise for the court to hold as a matter of law that one cannot "render aid designed to hinder apprehension," etc., to one who is conceded to be beyond the reach of law enforcement authorities. What this holding does in effect is to superimpose the requirement of actual or possible assistance upon the common law offense, and create commensurately the defense of impossibility to an accessory charge. I find no authority for this position,[3] and believe it to be based upon an unsound view of why the legislature has chosen to punish accessories in the first place.

The current jurisprudential trend is to eliminate the defense of impossibility. *Commonwealth v. Henley,* 312 Pa.Super. 564, 459 A.2d 365, 367 (1983); *see, e.g., State v. LaTraverse,* 443 A.2d 890, 893 (R.I.1983) (judicial abolition); *State v. Henderson,* 416 A.2d 1261, 1264 (Me.1980) (statute); *see generally* Model Penal Code (U.L.A.) § 5.01 (1974). The policy underpinning this trend is the traditional common law view that the culpability of an actor is best judged solely by his manifested intent and conduct. *See, e.g., People v. Dlugash,* 41 N.Y.2d 725, 726, 363 N.E.2d 1155, 1156, 395 N.Y.S.2d 419, 420 (1977) ("The ultimate issue is whether an individual's intentions and actions, though failing to achieve a manifest and malevolent criminal purpose, constitute a danger to organized society of sufficient magnitude to warrant the imposition of criminal sanctions.");

---

**2.** The majority interprets the elements of the offense to require that the aid rendered had or might have had the *effect* of hindering the principal's apprehension, rather than requiring proof that the accessory's action was *designed* (intended) to have that effect. Here, Abdul-Mani's false report of the stolen car could be viewed by a reasonable jury as aid designed to hinder Belfield's apprehension, trial or punishment. *See State v. Hicks,* 22 N.C.App. 554, 557–58, 207 S.E.2d 318, 320–21 (1974) (giving false testimony for purpose of helping principal supports accessory charge) (quoting *State v. Potter,* 221 N.C. 153, 156, 19 S.E.2d 257, 259 (1942)).

**3.** My research has disclosed one case noting expressly that the accessory "did aid" the principal, *State v. Hicks, supra* note 2, 22 N.C.App. at 558, 207 S.E.2d at 321, but no cases holding that a showing of actual aid is a necessary element of the common law accessory offense. In most of the published cases, it is fairly obvious that the accessory's action did actually aid the principal in some way. In my view, however, this is not a sufficient reason to require the government to make such a showing in every case.

*State v. Gosser,* 33 Wash.App. 428, 437, 656 P.2d 514, 519 (1982) (purpose for abolition of impossibility defense is to punish "culpable intent") (quoting *State v. Davidson,* 20 Wash.App. 893, 897–98, 584 P.2d 401, 404 (1978)). This culpability, it is believed, should not be mitigated by external circumstances outside the actor's control that are later ascertained by appellate courts reviewing cold transcripts with twenty-twenty hindsight. *See generally* Model Penal Code Tent. Draft No. 10, Article 5, at 30–38 (1960) (discussing rejection of impossibility defense).

If Abdul-Mani reported the car stolen on July 31 with the *belief* that Belfield needed such assistance to perfect his escape, then in my opinion the conviction should stand regardless of whether Belfield was *actually* safe in Iran on that date. Because I believe that the evidence adduced at trial reasonably permits such an inference, I would not reverse the jury's verdict.

Although I accept the rule set forth in part I–A of the majority's opinion regarding the quantum of proof necessary to establish the existence of a conspiracy as a predicate to admitting coconspirator hearsay evidence, I think the challenged evidence, in the main, was not hearsay because it would have been admissible, regardless of the truth asserted therein, as showing relevant circumstances surrounding Abdul-Mani's actions as an alleged accessory. Therefore, I cannot join in part I–B.

With the exception of the sufficiency of accessory charge against Abdul-Mani and the related analysis of hearsay evidence, I join in the majority opinion in all other respects.