Anthony A. WALKER & Brian Boyd, Appellants,

v.

UNITED STATES, Appellee.

Nos. 99–CF–1614, 99–CF–1650.

District of Columbia Court of Appeals.

Argued March 26, 2009.

Decided Oct. 22, 2009.

Brigitte L. Adams, appointed by the court, for appellant Walker.

Judith A. Lovelace, appointed by the court, for appellant Boyd.

Suzanne C. Nyland, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III and Chrisellen Kolb, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, BLACKBURNE-RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

A jury found each of the appellants, Anthony Walker and Brian Boyd, guilty of multiple counts of assault with a dangerous weapon ("ADW") (pistol) (D.C.Code § 22–502 (1981)); kidnaping while armed (D.C.Code §§ 22–2101, –3202 (1981)); threats (D.C.Code § 22–2307 (1981)); first-degree burglary while armed (D.C.Code §§ 22–1801(a),–3202 (1981)); and possession of a firearm during a crime of violence ("PFCV") (D.C.Code § 22–3204(b) (1981)).

Each was also found guilty of conspiracy (to commit assault, burglary, kidnaping, threats, and robbery) (D.C.Code § 22–105(a) (1981)); misdemeanor destruction of property (D.C.Code § 22–403 (1981)); carrying a pistol without a license (D.C.Code § 22–3204(a) (1981)); possession of an unregistered firearm ("UF") (D.C.Code § 6–2311(a) (1981)); and possession of unregistered ammunition ("UA") (D.C.Code § 6–2361(3) (1981)). Both Boyd and Walker argue that the trial court erred in admitting co-conspirator testimony, entitling them to reversal of their convictions. Boyd raises a number of additional challenges as well, including that the trial court erred in denying his *Batson* challenge and his motion for severance; in precluding the admission of a statement that one of the complainants made to police; and by giving (or failing *sua sponte* to give) certain jury instructions. Boyd also argues that the evidence was insufficient to support his convictions for CPWL, UF and UA, that the evidence did not support two kidnaping convictions as to each victim, and that the court violated his right to be present during all phases of the trial proceeding. Finally, Boyd argues that certain of his offenses merge. We affirm in part, reverse in part, and remand for the trial court to vacate two kidnaping convictions per appellant and all but one of each appellant's ADW convictions.

**I.**

Appellants' convictions arise out of the events of October 16, 1998, described at trial largely through the testimony of victims Dwayne Easterling and Alonzo Washington and co-conspirator Damion Travis. Easterling, the first of the three to take the stand, testified that, on the day in question, he was at the home of Frances Pettis [1] when Washington also arrived at

---

**1.** Pettis's house is located in the 5200 block of 13th Street, N.W., in the vicinity of Georgia

Pettis's house. As the two men stood talking outside Pettis's house, three masked men ran up, threw Easterling on the ground, pulled his jacket over his head, and handcuffed him, and two of the assailants threw him in the trunk of a car.[2] Easterling heard the "commotion" of the assailants "trying to get [Washington] in the car" as well. The car pulled off, and after about 30 or 40 minutes, came to a stop. Easterling could hear the men hitting Washington with something and asking Washington "where is the money." The men then removed Easterling from the trunk, took his wallet and cell phone, removed his shoes and socks, tied him up (making sure he couldn't see anything), and then threw him into a shed or abandoned garage. From Washington's voice, Easterling could tell that he, too, had been put in the shed. Easterling then felt stinging on his foot, as if one of the men was burning his bare foot with a cigarette, as the men demanded money. Eventually, Easterling told the men that he had $5,000 in the basement of his mother's house on Rittenhouse Street, N.W.[3] One of the men pulled Easterling's hood from over his eyes so that he could see his keys and asked him to identify the key to his mother's house, which he did. Easterling then heard the men debating about which of them should stay at the shed "to be on guard." After a while, Easterling no longer heard voices other than Washington moaning and groaning. Eventually, Wash-

ington helped untie Easterling after getting duct tape off of himself. With Easterling still handcuffed, the two ran barefoot toward Easterling's mother's house. Approaching his mother's house, Easterling saw Travis and appellant Walker pacing in front of the house.

Instead of continuing to his mother's house, Easterling and Washington ran to the house of a neighbor, Janet Baken, and asked her to call the police. From Baken's house, Easterling saw a white Lincoln parked nearby (and Baken testified that she saw a white Lincoln with one person in it drive by). Easterling next saw his brother Roger Reddock running out of his mother's house looking "scared," and then saw the white Lincoln driving away as police arrived in the area.

Washington's testimony largely corroborated Easterling's. Washington's eyes were covered by the hood of his jacket during the abduction, but he recognized the voice of one of the abductors as appellant Walker's. Washington testified that he was not familiar with appellant Boyd's voice.[4]

Prior to appellants' trial, Travis pled guilty to kidnaping, assault, burglary and robbery based on the events of October 16, 1998. He testified at appellants' trial pursuant to a plea agreement with the government. Travis recounted that on October 16, 1998, appellants Walker and Boyd, a man named Michael Owens,[5] and he got

Avenue and Ingraham Street.

2. Pettis testified that she watched from an upstairs window as two men wearing ski masks and gloves put Easterling in the trunk, and forced Washington into the back seat, of a car that looked like a "shorter version of" a white Cadillac, and then drove off.

3. Easterling testified that he did not actually have that money there, but that he sometimes kept at his mother's house money he received from selling drugs.

4. Easterling testified that, although he had known Boyd for several years, he did not recognize Boyd's as one of the voices he heard while in the shed. He volunteered that this was because the voices were "disguised."

5. Shortly before appellants' trial, Owens entered a guilty plea to charges arising out of the events of October 16, 1998. Unlike Travis, Owens did not agree to cooperate with the government, and he did not testify at appellants' trial.

involved in a "move," meaning a robbery. Travis, who owned a white Lincoln, explained that he was approached by Walker, Boyd and Owens and said "yes I would go on the move with them." [6] The four men got into Travis's car and then made a stop on Allison Street, where Boyd changed into an army-type vest and fatigues. Travis was directed to drive to Ingraham Street, near Georgia Avenue. There, Owens was directed to get out of the car and walk down the alley to see who was in the alley. When Owens returned, there was a brief conversation, and then Travis drove around to the front of a house on 13th Street. While the car was in front of the house, Boyd handed out three sets of masks and gloves for Walker, Owens and himself. While Travis stayed in the car, the other men got out of the car and went to the back of the house. Travis was directed to pull around into the alley in about 30 to 45 seconds. When he did so, he saw two men with clothing over their heads being handcuffed or taped. Walker and Boyd placed one man in the trunk of Travis's car and Owens, who had a gun, placed the other man in the back seat. Travis was directed to drive to a certain alleyway. He stopped the car there, and Walker and Boyd took the two abductees out of the car and carried them to a shed as Owens and Travis stood and watched. Boyd removed shoes from one of the men.

Thereafter, Travis acted as lookout. There followed "a conversation about money and drugs." Boyd used a cigarette to burn the foot of one of the abductees. Eventually, Walker, Boyd, Owens and Travis got back into the car and, "divided up the drugs and cell phone and stuff." Travis was directed to drive the car to Rittenhouse Street. He drove past the house and then came back to it a second time, and Travis and Owens then got out of the car. Walker got into the driver's seat of the car. Wearing masks and gloves supplied by Boyd, Travis and Owens, who had "volunteered" to go into the house, went inside the house using keys taken from one of the abductees. Travis had been "told by someone that money was in the house" and was "told" to look in the basement. Travis's understanding was that Boyd and Walker would wait in the car and that any money and drugs found in the house would be "split between all of us." As Travis ransacked the house looking for money and drugs, Owens watched, "holding the gun." [7] At one point, Owens held a gun to a man who was in the house and Travis hit the man, who fell. At another point, Owens was talking to a woman in a bedroom and Travis peeped in. The man who had fallen got up and ran out of the house, and Travis chased after him, but, seeing police, told Owens to "come on," and the two ran out the back door of the house.[8]

6. The court, posing a question from the jury, asked Travis, "Who asked you to join the move." Travis replied, "I was approached by all of them."

7. Travis testified that there was only one gun, and that Owens had it the whole time.

8. The government's witnesses also included Muriel Dickson, who lives at the Rittenhouse Street address. She testified that on the day in question, she was in her bedroom, saw police officers outside her window, and then turned around and saw a man with a black stocking over his face and a gun in his hand.

Dickson heard another man shout from downstairs and then saw a second man with a black stocking mask stick his head through the bedroom door.

Kimberly Diggs, who was in the 500 block of Rittenhouse Street at around the same time, also saw a white Lincoln drive by a couple of times. Seated inside the car were Walker, Boyd and a third man (whose name Diggs did not know at the time but later learned was Travis). The first time the car went by, Diggs made eye contact with Boyd and waved, and Boyd gave her a "peace sign" in return.

## II.

We address appellants' assignments of error roughly in the order in which the issues arose at trial.

## A.

■ Before trial, Boyd filed a motion for severance of his trial from that of his co-defendants,[9] pursuant to Super. Ct. Crim. R. 14, arguing that "evidence of his complicity ... is *de minimis* when compared to the evidence against his co-defendants," thus "raising the specter of guilt by association." He argues that the trial court erred in denying the motion. He relies on *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) ("When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened"), asserting that "[o]f the overwhelming amount of testimony, only a minuscule portion—other than that of Mr. Travis—linked Mr. Boyd to the crime spree."

■ We will reverse the denial of a motion for severance only upon a clear showing that the trial court abused its discretion, which must entail a demonstration "not simply that [appellant] was prejudiced but that [he] suffered 'manifest prejudice' from ... joinder." *Payne v. United States*, 516 A.2d 484, 490 (D.C. 1986) (explaining also that "a defendant does not suffer 'compelling prejudice' merely because a significant portion of the government's evidence admitted at trial is applicable only to his codefendants"). We cannot find an abuse of discretion here. It is true that most of the evidence against Boyd came in through Travis's testimony (about which both Boyd and Walker raise a separate issue, *see* section D *infra* ), but Travis's account attributes to Boyd a significant role in the crimes. Travis testified that Boyd was the one who handed out masks and gloves to the other assailants, both before the abduction and before the burglary. Boyd was also one of the assailants who threw Easterling into the trunk of the car and into the shed, and Travis identified Boyd as the assailant who took Easterling's shoes and burned his foot with a cigarette. In addition, Diggs testified that she saw Boyd in the white Lincoln along with Travis and Walker around the time of the burglary. The evidence that arguably made the government's case against co-defendant Walker stronger than its case against Boyd was Easterling's testimony that he recognized Walker as one of the men in front of his mother's house and Washington's testimony that he recognized Walker's voice in the shed. But, in light of the significant role that Travis attributed to Boyd and in light of Diggs's testimony about Boyd's presence on Rittenhouse Street with Travis and Walker around the time of the burglary, we do not agree that the evidence against Boyd was so "minuscule" that he was prejudiced by joinder of his trial with Walker's.[10]

Reddock testified that he was admitted to his mother's home at gunpoint and was ordered by two men to lie on the floor and tell them where the money was. The men threatened Reddock, one of the men hit him in the head with a gun, and, after he fell, the other man stomped him in the face. The assailants searched the house, damaging two doors. Reddock fled from the house as police were arriving.

9. At the time, Boyd's co-defendants included appellant Walker and Owens.

10. Boyd's additional argument, that he was entitled to a separate trial because of Easterling's and Travis's testimony that they knew Boyd from selling drugs, has no merit. This could have come in even in a separate trial. For example, the testimony that Easterling blurted—that he and Boyd "used to hustle together"—came in as the prosecutor was

**B.**

During jury selection, when counsel were exercising their peremptory strikes, the prosecutor struck only African–American female jurors through round seven,[11] and then struck two African–American male jurors. Citing *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Boyd's counsel raised an objection based on the "numbers" (of African–American females stricken) and on the fact that "many of the strikes by the Government were people who had no answers to any of [the court's preliminary] questions."[12] After hearing the prosecutor's explanations and Boyd's response, the court denied the *Batson* challenge. The fourteen-person jury that was seated had (including alternates) eleven African–Americans, including nine African–American women. On appeal, Boyd renews his *Batson* challenge, contending that he is entitled to reversal of his convictions because the court failed to "conduct[ ] the appropriate probe" and be-

cause the trial court's finding that the prosecutor's explanations were not pretextual "does not comport with the record."

When Boyd raised his *Batson* challenge, the court first observed for the record that the jury venire had consisted of 68 prospective jurors, 22 of whom were white and 46 of whom were black.[13] The court also noted that Boyd was "not pointing to white nurses who were questioned and black nurses who were not, things of that nature which gives a clear suggestion that there is a decision made based on race. . . ." The court understood, however, that "numbers alone can raise a *prima facie* case." The court therefore sought explanations from the prosecutor about her strikes.[14]

The prosecutor responded that she struck juror 23 because she "had neglected to inquire of [the juror] what her opinion was of the law enforcement involved in prosecuting her son," who the juror had

asking questions designed to elicit that "a person who actually knew [Easterling] [and presumably knew that Easterling sometimes had large sums of cash] was Brian Boyd."

**11.** At that point, the defense had stricken seven white jurors.

**12.** *See also Robinson v. United States*, 878 A.2d 1273, 1277 (D.C.2005) (holding that "the purposeful exclusion of prospective jurors because they are black and female is discrimination on account of both race and gender in direct violation of *Batson* ").

**13.** The court did not make a finding about how many prospective jurors were African–American females, but the prosecutor observed that the venire was "close to two-thirds black women." After strikes for cause, only 36 jurors–12 whites and 24 non-whites-had remained when the peremptory strikes began.

**14.** As we explained in *Smith v. United States*, 966 A.2d 367 (D.C.2009),

[I]f the defendant makes the threshold showing, the burden shifts to the govern-

ment to come forward with a neutral explanation that is related to the particular case to be tried. . . . The prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause, . . . and the second step of this process does not demand an explanation that is persuasive or even plausible. . . . But the prosecutor must offer a clear and reasonably specific explanation of his legitimate reasons for striking the juror in question. . . . If the Government satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination. . . . Ultimately, the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. . . . Because the trial court's task at this third step will involve an evaluation of the prosecutor's credibility, the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge.

*Smith*, 966 A.2d at 374–75 (citations, quotations marks and alterations omitted).

said was serving a sentence of "about ... nine years." As to this juror, defense counsel said that she would "submit," recalling that the prosecutor had "wanted to bring that person back up." The prosecutor explained that she struck juror 28 because this juror "gave a very snippy attitude" and "seemed as though she was taking offense to me ... as though she changed the tone of her voice when I inquired of her." Regarding juror 29, the prosecutor explained that she observed "a gaze between [the juror] and the defendants" as the juror approached the bench as well as "gazes toward the juror from the defendants" (who, the judge observed, "were present at the bench throughout the voir dire") that the prosecutor thought were inappropriate. The prosecutor struck jurors 25, 46, and 52, who were not employed outside the home, because of the prosecutor's experience that, for unemployed jurors, "being on time is always a problem;" they "just really frustrate the process." Continuing her explanation, the prosecutor stated that she struck juror 41, a certified nursing assistant in a nursing home, because she "worked within a close area of this particular offense," because she "did like social work type of work," and because the prosecutor thought that "to some extent some of the things she dealt with [in her work] might kind of haze her opinion as to what's going on." Regarding juror 21, the prosecutor said that she was "not sure," but thought that juror 21 was one of the jurors who referenced vacation plans and because "I really thought the vacation issue or work travel was going to be an issue with her." As to jurors 56 and 59, both African–American males, the prosecutor explained that she struck them because they were "giving me

the once over" and "looking me up and down," causing the prosecutor to anticipate a situation like one she explained had "created problems in the middle of a trial" in another case.

The court noted that at that point the burden shifted to Boyd to show that the government's explanations were pretextual. Boyd's counsel reiterated that none of the jurors whom the prosecutor struck had given affirmative responses to the preliminary questions that the court had asked, and argued that "without more, [the prosecutor's] answers are a cover for discriminating against the black race and females." Boyd's counsel added that "the argument that somebody who doesn't have a job might be late is not a normal argument," because "[e]verybody is sort of a homemaker and doesn't have a job because nobody has to go to work during the trial. ..." Finally, Boyd's counsel responded that the prosecutor's reliance on gut feelings and about "the attitude and the look" was not sufficient "to get beyond *Batson*." [15]

The court noted that the prosecutor's explanations "don't have to amount to a challenge for cause, they only cannot be for discriminatory reasons." The court also observed that "the prosecutor who stands accused of discriminating against blacks is herself black," a fact that in the court's view did not preclude discrimination but "makes it, if anything, less likely if it's a factor at all." While recognizing that "even one [strike] for racial motivation is unacceptable," the court found that the prosecutor's strikes were "less out of balance on the numbers case," and that the prosecutor's explanations "seem to me to

15. Notably, in explaining one of her own strikes after the government made its own (unsuccessful) *Batson* challenge, Boyd's counsel explained that one reason for the strike was that the juror "did not look at me. And I asked her four questions and she looked only at the Court."

be within the ambit or perimeter of good faith possibilities ... I'm not able to find under these circumstances that they are pretextual, sham explanations."

Boyd now faults the trial court for not "prob[ing] the prosecutor to determine why similarly situated jurors were treated differently," and argues that the "sham" nature of the prosecutor's explanations is "strikingly obvious" when one looks at jurors the prosecutor did not strike, who "bore close resemblance to" the stricken jurors. The fact that the prosecutor did not strike these jurors, Boyd argues, provided the trial court with "overwhelming evidence that the true basis for the strikes was [jurors'] race and gender." Boyd also emphasizes that the prosecutor relied on reasons inconsistent with what some stricken jurors said, and argues that the prosecutor's explanations referring to jurors's "haze" and "snippiness" were not legitimate reasons.

The record does show that the factual premise for some portions of the prosecutor's explanations was incorrect. For example, juror 21 had made no mention of vacation plans and juror 41 did not say that she worked near the crime site (only that she knew the general area of "Inger-

man [sic] and Georgia Avenue").[16] Boyd is also correct that the prosecutor did not strike three jurors who had similarities to stricken jurors: juror 43, a nurse who worked in a facility three blocks from the crime scene, and who had vacation plans; juror 24, who was a nursing technician; and juror 44, who was retired, and thus did not work outside the home.[17] But, as can be seen from the summary of Boyd's counsel's response that we have set out above, Boyd's counsel pointed out none of these discrepancies, and thus did not alert the trial court that further probing might be required. Boyd could not meet his burden at *Batson* step three, see note 14 *supra*, without challenging the factual basis of the prosecutor's explanations and pointing out inconsistencies.[18] *See Smith,* 966 A.2d at 387. That is especially so on this record because, like *Smith,* this case was not "particularly racially charged." *Id.* at 378. As the trial judge noted, the prosecutor herself was an African–American female, and, as in *Smith,* "there is no evidence that the jurors who heard the case had to make a credibility assessment between witnesses of different races [or genders]," or that "the prosecutor was attempting to eliminate jurors who were of a

**16.** The prosecutor had acknowledged that she was "not sure" that juror 21 was one of the jurors who had vacation plans.

**17.** As the government notes, however (and Boyd does not dispute), juror 44 herself was an African–American female, so the fact that she was not stricken does not provide an example in which "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, ... evidence tending to prove purposeful discrimination...." *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

**18.** "To rebut meaningfully the prosecution's race-neutral reasons for striking jurors, defense counsel needed to '(1) point out that the

prosecutor's claims about the particular juror are false,' (2) to 'point out that although the prosecutor's claims about an excluded juror are true, similar claims can be made about non-excluded jurors who are not minorities, which should raise the suspicion of bad faith,' or (3) to 'argue that claims about the juror, although true, are so irrational as a reason for striking a juror that they might be pretexts for some undisclosed discriminatory reason.' " " *Smith,* 966 A.2d at 387 (quoting (Leon) *Robinson v. United States,* 878 A.2d 1273, 1290 (D.C.2005) (further citations omitted))."

Boyd's counsel did argue that the prosecutor's reasoning about jurors who do not work outside the home was not "normal," but the prosecutor's reasoning was not illogical (even if-as is possible-it would not stand up to empirical testing).

different race [or gender] from prosecution witnesses," or that "the prosecutor subjected African–American venire members to more difficult questioning than non-African-American members, or that she pursued certain types of questions only with African–American venirepersons."[19] *Id.* at 379. Moreover, as already described, a majority of the jurors who were seated—nine out of 14 jurors—were African–American women (and two others were African–American men).

■■ Finally, we reject Boyd's argument that an explanation based on a juror's perceived "snippiness" toward or perceived inappropriate looks at the prosecutor, or on a juror's perceived better rapport with opposing counsel, is not legally cognizable as a race-neutral explanation in the context of a *Batson* challenge. As we observed in *Smith*, "concern about a juror's rapport with opposing counsel can be a legitimate, race-neutral basis for a peremptory strike." 966 A.2d at 384 n. 27 (citing *Majid v. Portuondo*, 428 F.3d 112, 117, 131 (2d Cir.2005)); *see also United States v. Rodriguez*, 178 Fed.Appx. 152, 156 (3d Cir.2006) (reasoning that prosecutor's explanations about his perception of jurors' lack of eye contact were sufficient at *Batson* step two); *United States v. Cordova*, 186 Fed.Appx. 742, 744 (9th Cir. 2006) (holding that trial court did not plainly err by permitting prosecutor's strike for proffered reason of juror's "neg-

ative body language and eye contact"). It bears reiterating that "explanations based on rapport ... must be closely scrutinized because they are subjective and can easily be used by a prosecutor as a pretext for excluding persons on the basis of race."[20] *Smith*, 966 A.2d at 383. But we are unwilling to conclude that a counsel who perceives, from prospective jurors' attitudes, eye contact or rapport, that the jurors are partial to the opposition, may not on that basis use peremptory strikes to eliminate the jurors from the panel.[21] After all, even though peremptory challenges "are not of federal constitutional dimension," they are granted "to help secure the constitutional guarantee of trial by an impartial jury." *United States v. Martinez–Salazar*, 528 U.S. 304, 311, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000).

In sum, we reject Boyd's *Batson* challenge, because we cannot conclude that the trial court's finding that the prosecutor's explanations for her strikes were not pretextual were clearly erroneous. *See Smith*, 966 A.2d at 388; *see also Nelson v. United States*, 649 A.2d 301, 312 (D.C. 1994).

### C.

During cross-examination, Boyd's counsel questioned Easterling in an effort to show discrepancies between his direct testimony and the statement that Easterling

---

**19.** "Greater scrutiny is required when the case is racially charged." *Smith*, 966 A.2d at 376 (citation omitted).

**20.** And, counsel are well-advised to watch all aspects of the voir dire proceeding, so as to be able to take issue with any disingenuous claims about such matters. Counsel's role is particularly important in light of research that suggests that "there is little reason to believe that judicial questioning will produce information useful for identifying [racial] bias" influencing the use of peremptory challenges during jury selection. *See* Samuel R.

Sommers & Michael I. Norton, *Race–Based Judgments, Race–Neutral Justifications: Experimental Examination of Preemptory Use and the Batson Challenge Procedure*, 31 L. Hum. Behav., 261, 269 (2007).

**21.** This is different from "challeng[ing] [all African–American jurors as a group] on the assumption ... that they would be partial ... because of their shared race." *Smith*, 966 A.2d at 380 n. 20 (quoting *Batson*, 476 U.S. at 97, 106 S.Ct. 1712).

signed after he was interviewed by police. As Boyd's counsel reminded the court, the impeachment was regarding "the number of people, and ... which suspect was doing what" as the kidnaping transpired. Before the end of trial, Boyd sought to have the signed statement admitted as an exhibit. After Walker's counsel objected to admission of the entire statement, the court ruled that counsel could refer to Easterling's signed statement in closing argument, but that the statement would not be admitted into evidence. Boyd argues that the court's ruling erroneously denied him the right to present exculpatory evidence. We disagree.

In arguing for admission of the statement, Boyd told the court that Easterling "testified that there were, like, two people or three people who were doing one thing or another, but I brought out that in his statement he only specifically talked about one person, suspect one or suspect two, you know, did something to the other person." In his brief to this Court, Boyd argues that, in the statement, Easterling "attribute[d] every single action from the onset of the kidnapping solely to S–1." The record belies these arguments. The signed statement does attribute most of the activity described to "S–1" or "S–2," but it also recounts that "S–1, S–2 and S–3" gagged Easterling and Washington. Thus, we cannot agree that the statement is exculpatory as to Boyd (especially in light of Travis's testimony that Boyd, Walker and Owens handled the victims while Travis drove the white Lincoln or acted as lookout). We also think it likely

that, if shown the statement, reasonable jurors would have recognized that Easterling himself almost certainly had not used the "S–1," "S–2," and "S–3" designations (and that the statement he signed was prepared in part by someone else), and that the jury would have accorded limited weight to discrepancies that might have been occasioned by the use of such police jargon. Further, Easterling testified that he could not see his assailants during the kidnaping, testimony that probably would have caused the jury to accord little weight to his written statement about which assailant did what.[22]

■ The admissibility of evidence "is committed to the sound discretion of the trial court, and this court will not disturb its ruling absent an abuse of discretion." *Donte v. United States*, 940 A.2d 118 (D.C. 2007) (citation and internal punctuation omitted). For the foregoing reasons, and also because Boyd's counsel vigorously cross-examined Easterling as to the statement,[23] we think the trial court's ruling was well within its discretion. Even if *arguendo* it was error for the court to deny Boyd's request to admit the signed statement as an exhibit, we can say, "with fair assurance, after pondering all that happened without stripping the [arguably] erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see also Jefferson v. United States*, 328 A.2d 85, 86 (D.C.1974) (per curiam) (error in not allowing document into jury room was harmless because "the

---

22. At the end of the written statement, there are descriptions of S–1, S–2 and S–3. Easterling explained that these were descriptions of men he saw on Rittenhouse Street, not descriptions of the men who abducted him or were in the shed.

23. For example, Boyd's counsel pointed out to Easterling, "And then you went on to say [in the signed statement] suspect 1, suspect 2 and suspect 3 gagged you.... You didn't say the four suspects ... correct?" When Easterling said that he did "not remember saying that," Boyd's counsel offered to show him the document again to refresh his recollection.

evidence relevant to credibility was sufficiently placed before the jury and it was well aware of the existence and content of the prior statement").

### D.

■ The sole issue that Walker raises on appeal relates to the admissibility of testimony by co-conspirator Travis—an issue that Boyd also raises as a major focus of his appeal. Relying on *Butler v. United States*, 481 A.2d 431 (D.C.1984), both appellants argue that the court erred by failing to make the requisite findings before allowing Travis's testimony. Specifically, they contend that, before Travis's testimony could be properly admitted, the government first had to show and the court had to find "that the declarant and the defendant were members of a conspiracy; that the conspiracy existed at the time the statement was made; and that the statement was made in furtherance of the conspiracy." Appellants argue that the court's putative error was not harmless because, without what they claim was Mr. Travis's erroneously admitted testimony, "there would be no direct evidence of a conspiracy in the record."

Much of Travis's testimony on which appellants focus came in before the issue of co-conspirator statements was raised with the court. In the early part of the government's direct examination, Travis testified as follows, without any contemporaneous objection:

TRAVIS: I was approached by [Walker] and [Boyd] and [Owens].

. . .

PROSECUTOR: And did you have a conversation with them?

TRAVIS: Yeah, a brief conversation.

PROSECUTOR: And then after the conversation, did you say anything back to them?

TRAVIS: Yes.

PROSECUTOR: What did you say back to them?

. . .

TRAVIS: I had said yes I would go on the move with them.

PROSECUTOR: What did you understand the move to mean?

TRAVIS: Robbery.

Appellants argue that admission of this testimony was plain error because it was "clearly the elicitation of a statement by one or more coconspirators" before the court had determined admissibility in accordance with *Butler*.

During trial, however, neither defense counsel raised an objection until Travis continued with the following testimony (describing what transpired just before Easterling and Washington were abducted from the rear of Pettis's house), to which Boyd's counsel objected:

PROSECUTOR: Now, before [Owens] got out of the car— well, how was it that [Owens] was the one who got out of the car?

TRAVIS: He was directed to get out the car.

PROSECUTOR: Was there some kind of conversation?

TRAVIS: Yes.

. . .

PROSECUTOR: And what was he directed to do?

TRAVIS: To walk down the alley in—

[Boyd's Counsel]: Objection, Your Honor. Hearsay.

THE COURT: Overruled.

. . .

PROSECUTOR: Please continue.

TRAVIS: He walked down the alley see who was in the alley.

As the direct examination proceeded over the objection of Boyd's counsel, and as Travis was describing what happened when he and the other three assailants arrived as Easterling's mother's house to look for money, the prosecutor asked Travis, "when you and [Owens] went into the house, what was your understanding of what [Boyd] and [Walker] were going to do in the car?" At that juncture, both defense counsel objected, with Walker's counsel asserting that the court had "to determine first [that] there was a conspiracy." The court first asked, "Doesn't talking about their plans go to conspiracy?" The court then said:

COURT: Well, let's see, what you have is they kidnapped [sic] two people.... Took them to the shed. Took keys off of them to go to this house. And got back into the car and went to the house. So at least you have concerted effort in all four of them participated in all of that.... Once they kidnap the people, which according to his testimony [Boyd] and [Walker] participated in, and then they've gone to the shed and taken keys and gone in the house ... I think it's a reasonable inference there's a conspiracy here.

Appellants assign several specific errors based on this record. They argue that the trial court focused on "the third element" of conspiracy, i.e., whether specific acts were taken in furtherance of a conspiracy, ignoring whether there was "any corroboration as to the formation of an agreement between or among the participants." In addition, appellants argue, the trial court

"used 'reasonable inference' as its standard of proof, which fall short of the level of proof required by Butler." Appellants contend that the trial record that preceded Travis's testimony "fails to demonstrate by a more likely than not standard the existence of an agreement between or among any co-conspirators. It only demonstrates that acts were carried out by the defendants." They urge further that the harmful impact of the error can be seen from the fact that Travis "was allowed to testify that the four [men] agreed to split the money and drugs they took during the kidnaping," that "the others said they would split the proceeds of the robbery" and "that they would wait in the (getaway) car during the burglary."

Appellants' arguments reflect a misunderstanding of Butler. The rule that we established in Butler about the prerequisites for admission of a co-conspirator statement relates to application of the so-called "co-conspirator statement exception" to the hearsay rule, an exception recognized in Fed.R.Evid. 801. The Federal Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Id. § 801(c). The Federal Rules go on to provide, however, that a statement made "by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Fed.R.Evid. 801(d)(2)(E). Explicitly adopting Rule 801(d)(2)(E), we held in Butler that "a coconspirator's out-of-court assertions may be admitted as nonhearsay evidence in the courts of this jurisdiction only if the prosecution proves that (1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy."

*Butler,* 481 A.2d at 439. We observed that the trial judge ordinarily "should make the admissibility determination during the prosecution's evidence," *id.* at 441, and we held that, before a coconspirator's out-of-court assertions, may be admitted, "the existence of the conspiracy must be proved to be 'more likely than not.'" *Id.* Finally, we said that "[w]e agree with those jurisdictions which mandate consideration of only the independent nonhearsay evidence in the admissibility determination.... This approach ensures the reliability of coconspirator's statements admitted at trial by determining that sufficient corroborating evidence of a conspiracy exists. It also guards against the danger of 'bootstrapping,' *i.e.,* using hearsay evidence to justify its own admission." *Id.* at 440 (citations omitted).

 Thus, the rule established in *Butler* applies to preclude the trial court from relying on a co-conspirator's out-of-court assertions—assertions that would be hearsay but for the co-conspirator exception—to find the existence of a conspiracy. But, if the government does not seek to admit out-of-court hearsay assertions, application of the *Butler* rule is not triggered.[24] That describes what happened in this case. Travis testified that he was asked whether he would "go on the move;" that Owens was directed to "get out of the car;" that Boyd was directed to "walk down the alley;" and that Travis was directed to "look in the basement" for money. Thus, the testimony did not refer obliquely to out-of-court declarations; rather, it referred to questions posed or directions given by one or more of the men. Much of Travis's

testimony was similar to the testimony we analyzed in *Butler:* the statement by Hunter that Belfield "said tell him to report it stolen" was "not hearsay," we said; rather, it was "a directive offered to prove that instruction was given." *Butler,* 481 A.2d at 438 n. 10 (citing 6 WIGMORE, EVIDENCE §§ 1766, 1788 (Chadbourn rev. 1976)). Beyond that, Travis's testimony was almost entirely about what he saw (such as appellant Boyd burning Easterling's foot with a cigarette, both appellants forcing Easterling and Washington into the white Lincoln and putting them in the shed, and all four assailants dividing the loot obtained from the victims in the shed); or about what other assailants said they intended to do in the (near) future (*i.e.,* evenly share any money recovered, volunteer to go in the house, wait in the car during the burglary).[25] Travis did testify that he was "told by someone that money was in the house," but that assertion was not offered for the truth of the matter asserted (as the government elicited evidence from Easterling that there actually was no $5,000 in the house). Accordingly, because Travis's testimony was not of the type that required that *Butler*-type findings be made, there was no error even if the court admitted the testimony without first considering whether the government had shown by that point in the proceedings that it was more likely than not that a conspiracy existed.

 The foregoing discussion is also relevant to Boyd's argument that admission of "co-conspirator statements" through Travis's testimony contravened

---

24. *Cf. Akins v. United States,* 679 A.2d 1017, 1028 (D.C.1996) ("*hearsay* evidence ... may be introduced against a co-conspirator under the exception for admissions or statements of party opponent on the theory that one co-conspirator is the agent of another") (italics added).

25. *See* Fed.R.Evid. 803(3) (providing that a "statement of the declarant's then existing state of mind ... (such as intent [or] plan ...)" is not excluded by the hearsay rule).

his Sixth Amendment right of confrontation. "[T]he Confrontation Clause has no application" to out-of-court non-testimonial statements. *Whorton v. Bockting,* 549 U.S. 406, 420, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Testimonial statements describe past events. *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Utterances that are not statements of fact, but instead are directives or "proposal[s] of a future course of action" are non-testimonial and do not implicate the Confrontation Clause. *United States v. Spotted Elk,* 548 F.3d 641, 662 (8th Cir.2008); *see also United States v. Singh,* 494 F.3d 653, 658–59 (8th Cir.2007) ("co-conspirators' statements made in furtherance of a conspiracy ... are generally nontestimonial").

### E.

■■■ Boyd argues, and the government concedes, that his CPWL, UF, and UA convictions must be vacated for failure of proof. The government's theory behind the CPWL, UF and UA charges—as to both Boyd and Walker—was that appellants aided and abetted their co-conspirator Owens in his possession and carrying of a pistol during the events of October 16, 1998. The government presented proof that neither Boyd nor Walker had a license or registration for a pistol, but presented no evidence during appellants' trial that Owens lacked a license and firearm registration on the day in question. We have held, however, that to convict a defendant of CPWL, UF or UA on an aiding

and abetting theory, "the government must show that the principal (not the aider and abettor) was not licensed...." *Halicki v. United States,* 614 A.2d 499, 503–04 (D.C.1992). Accordingly, we agree with Boyd and the government that his CPWL, UF and UA convictions must be reversed.[26]

We will order reversal of Walker's CPWL, UA and UF convictions as well even though he did not challenge them on the basis discussed above.[27] *Cf. Carter v. United States,* 957 A.2d 9, 22 (D.C.2008) (concluding, upon agreeing with appellant Carter and the government that certain of Carter's convictions merged and should be vacated, that the same result should apply to co-appellant Tucker, even though "Tucker has not raised the merger issue, and the government's briefs do not address merger as to Tucker"); *see also United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("a rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with the rules of fundamental justice") (internal citations, quotation marks and other punctuation omitted).

### F.

Boyd argues that the trial court made a number of errors with respect to the jury

---

26. In light of this disposition, it is unnecessary for us to reach Boyd's additional arguments that his convictions fail for lack of proof that he constructively possessed the pistol and that the government's reliance solely on a certificate-of-no-record to prove lack of a license and registration violated the Sixth Amendment Confrontation Clause. *See Tabaka v. District of Columbia,* 976 A.2d 173 (D.C. 2009) (per curiam) (holding, on the basis of

*Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), that a certificate of no-record is "testimonial").

27. Walker's challenge is to all of his convictions, including the CPWL, UF and UA convictions, insofar as they were obtained on the basis of Travis's testimony.

instructions. As to all of the claimed errors, Boyd concedes that he did not object in the trial court, with the result that our review is only for plain error.[28]

The first of the claims is that Boyd's PFCV convictions should be voided because the trial court failed to "give a special unanimity instruction on PFCV." Boyd urges that "[w]hile the jurors may have been unanimous in convicting [him] of the underlying offenses, they may not have been unanimous on which charge the government had met its burden to prove the PFCV counts." But, as the government points out, the trial judge instructed the jury that "in order to find the defendant guilty of possession of a firearm during the commission of a crime of violence[,] all of you must agree that at least one of the acts of the violent crime was committed. And the one must be the same for all of you; you can't have some of you thinking one occurred and some of you thinking another occurred."

Next, Boyd cites the trial court's erroneous aiding and abetting instruction-the so-called "natural and probable consequences" instruction that we have held is legally erroneous as to specific intent crimes. See *Wilson–Bey v. United States,* 903 A.2d 818, 822, 830 (D.C.2006) (en banc); *Coleman v. United States,* 948 A.2d 534, 552–54 (D.C.2008). We agree that the instruction was erroneous as to the specific intent crimes of which Boyd was convicted.[29] But we also agree with the government that, in convicting Boyd, jurors must have credited Travis's testimony about Boyd's involvement in the "move," and there is no reason to think that they rejected the portions of Travis's testimony about the active and leadership role that Boyd played. The evidence was, *inter alia,* that Boyd handed out the masks and gloves for both the kidnaping and the robbery, burned Easterling's foot while making demands that he tell the abductors where money could be found, took Easterling's shoes, and waited in the getaway car while Travis and Owens ransacked the house. Boyd has not met his burden of persuading us that the instructional error affected his substantial rights, because, upon crediting the government's evidence, no reasonable juror could have failed to conclude that Boyd had the specific intent to rob Easterling and to accomplish the burglary of his mother's home.

Furthermore, the jury convicted Boyd of conspiracy. Under the conspiracy instruction given to the jury, appellants could be convicted of the substantive crimes so long as a co-conspirator committed the crime "for the purpose of carrying out the conspiracy." "*Wilson–Bey* did not question this court's continued adherence to the doctrine of [co-conspirator] vicarious liability." *Walters, supra,* 940 A.2d at 103. Here, upon convicting Boyd of conspiracy, the jury had a legally sufficient basis to convict him of all the crimes committed by any of the co-conspirators in furtherance of the "move" of October 16, 1998 (even if *arguendo* they did not find that Boyd shared the actors' intent with respect to each aspect of the "move").

We have not overlooked Boyd's additional argument that the erroneous "natural

---

**28.** Thus, Boyd must show "error that is plain and that affects substantial rights, and reversal is not appropriate unless the error seriously affects the fairness, integrity or public reputation of the judicial proceedings." *Lampkins v. United States,* 973 A.2d 171 (D.C.2009) (citations and internal quotation marks omitted).

**29.** *See Walters v. United States,* 940 A.2d 101, 102–03 (D.C.2007) (per curiam) (robbery is a specific intent crime to which the *Wilson–Bey* holding applies); *Douglas v. United States,* 570 A.2d 772, 776 (D.C.1990) (specific intent must be proven to convict a defendant of burglary).

and probable consequences" instruction may have tainted the conspiracy conviction itself, since the trial court did not tell the jury that the instruction did not apply to the conspiracy charge. But what the court did tell the jury was that, to convict a defendant of conspiracy, they must find that he "intentionally joined the agreement." [30] In addition, in light of Travis's testimony that "all of them"—Boyd, Walker and Owens—asked him to participate in the move, and that Boyd was the one who passed out the masks and gloves, only by a "bizarre reconstruction" [31] of the evidence could the jury have credited Travis's testimony about Boyd's participation (as it must have done) but found that Boyd did not agree to participate in the "move." [32]

▆ Finally, Boyd complains that when the court instructed the jury that they could weigh Boyd's testimony in light of his "vital interest in the outcome" of the case, the court erred by singling him out.[33] We reject this characterization. The court gave the instruction immediately after telling the jury that in considering the case, they could not consider the fact that a

defendant "has not testified" and that Boyd's testimony should not be disbelieved "merely because he is the defendant;" and immediately before telling the jury that it should give his testimony "such weight as in your judgment it is fairly entitled to receive." Taken together, these instructions told the jury that they should infer nothing one way or the other from the mere fact that a defendant did or did not testify. The court also instructed jurors more generally, as to all witnesses, that they might want to ask themselves, "Did the witness have a personal interest in the outcome of the case." Thus, "the instruction given ... was well balanced and very mild. It was not inflammatory and did not suggest the defendant should not be believed." *Clifford v. United States*, 532 A.2d 628, 641 (D.C.1987).

### G.

▆ At the close of trial, the parties agreed that the jurors in seats 5 and 3 would be alternates. After the verdicts had been rendered, Boyd's counsel noticed

---

**30.** The court also instructed the jury, as part of the aiding and abetting instruction, that "[m]ere physical presence by the defendant at the place and time the crime was committed is not, by itself, sufficient to establish his guilt."

We recognize that the prosecutor told the jury, during her closing argument, that "[u]nder the law, as the judge just provided to you, you can aid and abet each and every single count within this indictment." But the prosecutor followed that statement with:

When Michael Owens approached with a handgun, they're all responsible. When Michael Owens went in and struck Roger Reddock for the purpose of making demands of him in order to locate the money, they're all equally responsible for that. When Michael Owens went before Muriel Dickson demanding money, waving what we know now was a loaded unregistered handgun ..., they are all equally responsible for that.

Thus, the prosecutor focused on aiding and abetting the substantive crimes, and did not

suggest that the jury should find appellants guilty of aiding and abetting conspiracy.

**31.** *Wood v. United States*, 472 A.2d 408, 410 (D.C.1984).

**32.** Travis testified that he first met Owens when Boyd, Walker and Owens approached him about the move. Because Travis would not likely have reached agreement only with a man he was meeting for the first time, a reasonable inference can be drawn that Boyd or Walker, or both of them, procured the agreement with Travis. The fact that Boyd later passed out the masks and gloves supports an inference that, more so than Walker, Boyd played a leading role.

**33.** Boyd relies on *White v. United States*, 647 A.2d 766, 769 (D.C.1994) (referring to the "general rule against" singling out the defendant).

that the juror in seat number 5 was still there, but that the juror in seat 14 was not. The trial judge explained that, just before the jury started its deliberations, the juror in seat 14 (juror number 43) pointed out that she "had travel starting ... the weekend. She wouldn't be back until next Thursday. So, she became, in effect, unavailable." Therefore, the court excused the juror.[34] The judge further explained that he had been unable to predict whether deliberations would be done by Friday, September 3, while the juror in seat 14 had to leave town on Saturday, September 4. Both defendants noted objections. Boyd now argues that his "Sixth Amendment right to be present at every stage of the trial and to have assistance of counsel were violated when the court unilaterally dismissed a juror without consulting counsel." Boyd does not contend that the court had an inadequate reason for taking action,[35] but does assert that the court's reasoning was inconsistent with what the juror said. He clarifies in his Reply Brief that "[t]he issue here is not whether the trial court had the discretion to remove a juror who could not perform his duties. The issue is whether appellant had the right to be present at every stage of the trial...."

▮▮▮▮ "[I]t is a leading principle that pervades the entire law of criminal procedure that after indictment is found, noth-

ing shall be done in the absence of the prisoner." *Mooney v. United States,* 938 A.2d 710, 718 (D.C.2007) (quoting *Warrick v. United States,* 551 A.2d 1332, 1334 (D.C. 1988)) (internal punctuation and further citation omitted). However, the defendant's absence from a portion of the trial must "be considered in light of the whole record." *United States v. Gagnon,* 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam). "The defendant has no right to be present when presence would be useless, or the benefit but a shadow." *Frye v. United States,* 926 A.2d 1085, 1103 (D.C.2005) (internal citations and quotation marks omitted). That is the case here. The court released a juror because of her travel schedule (not because of any behavior the juror had exhibited or anything she had said or asked during the trial to distinguish herself), and replaced her with a juror who had been satisfactory to all parties (and, as with the discharged juror, there is nothing in the record to suggest that the juror acted or spoke in a way to distinguish herself during the trial). Boyd argues that "[h]ad he been informed, along with counsel, they could have requested that the determination of both alternates be re-evaluated" or that "number 3 stay instead of number five." But, since both alternates had been vetted for cause and "by definition, [were] fair and impartial," Wayne R. LaFave et

---

**34.** The government points out that during voir dire, Boyd moved to strike this juror for cause on the ground that she worked near the crime scene. The court denied the motion.

**35.** Such an argument would lack merit. *Cf. United States v. Nelson,* 102 F.3d 1344, 1349 (4th Cir.1996) (finding no abuse of discretion where trial court used alternates to replace jurors who had conflicting travel plans). Also, we reject Boyd's suggestion that "the court could have ... had the jury deliberate on the weekend." Trial concluded on Wednesday, September 1. The juror in seat 14, number 43, said that she had a prepaid vaca-

tion set to begin during the weekend (specifically, on Saturday, September 4). Nor can we accept Boyd's argument that "[a] better course would have been to allow the jury to begin deliberations, having excused the agreed on alternates, and then call an alternate back in if deliberations went into the next week." Such quibbling over the "better" alternatives intrudes too much into the trial court's "sound and advised discretion" as to trial management decisions. *Pierce v. United States,* 402 A.2d 1237, 1242 (D.C. 1979).

al., *Criminal Procedure*, § 22.3(c) at 116–17 (3d ed.2007), we cannot agree, without more, that this lack of opportunity prejudiced Boyd. Nor can we agree with Boyd that what occurred happened at a "critical stage in the proceedings." Assuming without deciding that the court erred in making the substitution outside defendants' presence, we conclude that appellant is not entitled to relief because he has not shown any prejudice from the error. *See Smith v. United States*, 389 A.2d 1356, 1361 (D.C.1978) (affirming conviction where failure to comply with Super. Ct. Crim. R. 43(a), providing that defendant "shall be present ... at every stage of the trial," was harmless error).

Boyd also asserts that the court's action that deprived him of the opportunity to be present during the determination about how to respond to the problem presented by juror 5's inflexible travel arrangements, in combination with the deprivation of his right to have his counsel's assistance at the time, amounted to structural error that requires reversal of his convictions. Boyd does not explain or develop this argument, however, and thus we do not address it,[36] other than by quoting the Supreme Court's instruction that, typically, an error is structural only when it "necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Rivera v. Illinois*, —— U.S. ——, 129 S.Ct. 1446, 1455, 173 L.Ed.2d 320 (March 31, 2009). There was no such error here.

### H.

The jury convicted Boyd of four counts of kidnapping,[37] but the government con-

cedes that Boyd's abduction of Easterling and Washington constituted two kidnappings, not four. Accordingly, we shall remand for two of the kidnapping counts (one as to each victim) to be vacated. We do the same to appellant Walker (even though only Boyd raised this issue. See section E *supra.*).

The government also concedes that two of Boyd's ADW convictions merge with his two armed robbery convictions and that two other ADW convictions merge with two kidnapping while armed convictions. Thus, on remand, the trial court must vacate four of Boyd's ADW convictions (leaving in place the fifth ADW conviction related to the assault committed against Reddock). We remand in Walker's case for the same purpose.

■ Boyd argues in addition that the record cannot sustain more than one of his PFCV convictions, because the "move" constituted "one continuous enterprise." *Cf. Matthews v. United States*, 892 A.2d 1100 (D.C.2006). We disagree. "Multiple PFCV counts do not merge where the predicate crimes each stem from a 'fresh impulse.'" *Wages v. United States*, 952 A.2d 952, 964 (D.C.2008) (citation and quotation marks omitted). Here, at each stage of the kidnaping, robbery and burglary, appellants reached a fork in the road where they could have desisted from their efforts. "[D]espite the proximity of the crimes in time and place, they constitute distinct violent crimes, and the PFCV convictions do not merge." *Id.; see also Stevenson v. United States*, 760 A.2d 1034,

---

36. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McFarland v. George Washington Univ.*, 935 A.2d 337, 351 (D.C.2007).

37. Kidnaping while armed for the purpose of assaulting Easterling; kidnaping while armed for the purpose of robbing Easterling; Kidnaping while armed for the purpose of assaulting Washington; and kidnaping while armed for the purpose of robbing Washington.

1038 (D.C.2000) (where defendants entered store with the requisite intent to rob the store, thereby completing the act of armed burglary, and then engaged in conversation with the store manager before then brandishing a gun at a store employee, they "clearly had time to reflect whether to continue on to the armed robbery," and thus the evidence supported multiple PFCV convictions).

For the foregoing reasons, as to each appellant we affirm the judgments of conviction for two counts of kidnaping while armed, first-degree burglary while armed, possession of a firearm during a crime of violence, conspiracy, and misdemeanor destruction of property. We also affirm the judgment of conviction for one count of ADW (Reddock). We reverse the judgments of conviction for CPWL, UF and UA. As to each appellant, we remand to the trial court so that it may vacate two kidnaping counts as to each appellant and the remaining convictions for ADW.

*So ordered.*